Carlyle B. HARRIS, et al., Plaintiffs,

v.

BOARD OF EDUCATION OF COLUMBUS, OHIO, CITY SCHOOL DISTRICT, et al., Defendants.

Civ. A. No. C–2–86–909.

United States District Court, S.D. Ohio, E.D.

June 26, 1992.

Webster Shoewalter Lyman, Columbus, Ohio, and Larry Delano Coleman, Kansas City, Mo., for plaintiffs.

Theodore Daniel Sawyer, Columbus, Ohio, Stephen David Martin, Worthington, Ohio, Lawrence Henry Braun and Larry Holliday James, Columbus, Ohio, for defendants.

## OPINION AND ORDER

GEORGE C. SMITH, District Judge.

### I. Introduction

On July 28, 1986, plaintiff Carlyle B. Harris, proceeding *pro se*, commenced this action against the Columbus, Ohio Board of Education (hereinafter "CBOE"), James G. Hyre, Superintendent, Larry Cunningham, Unit Manager, Personnel Services, Michael J. O'Leary, Principal, South High School. Thereafter, on March 27, 1987, Plaintiff Harris filed an Amended Complaint adding Columbus Educational Association (CEA) and James C. Voyles, Jr., Principal, Starling Middle School as additional party defendants and joined as plaintiff Ethel P. Baldwin. Defendant CEA has been dismissed from this suit. This matter is now before the Court on defendants' Motion for Summary Judgment.

Plaintiff Harris, a black male teacher, alleges that he was forced to retire and/or

was constructively discharged from his teaching position at South High School on January 31, 1985, following a special evaluation performed under § 401.03 of the Collective Bargaining Agreement (CBA) entered into between CBOE and CEA. *See* Opinion and Order, 11/23/88 at 1. Plaintiff Harris asserts that this act violates various civil rights statutes and was motivated by a discriminatory animus based upon his age, race, and handicap.

Plaintiff Baldwin, a black female teacher, alleges that she was forced to resign and/or was constructively discharged from her teaching position on April 17, 1984 following a special evaluation. Plaintiff Baldwin asserts that defendants violated various civil rights statutes and were motivated by a discriminatory animus based upon her race and gender. Opinion and Order 3/27/89 at 1.

Plaintiffs have articulated claims under 42 U.S.C. §§ 1981, 1983, 1985 and 1986, as well as claims under the Age Discrimination and Employment Act (ADEA), 29 U.S.C. § 623, Title VII of the Civil Rights Act, 42 U.S.C. § 2000e and pendant state law claims of defamation, breach of contract and intentional infliction of emotional distress.

## II. Standard of Review

Rule 56(c) of the Federal Rules of Civil Procedure provides that summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." The purpose of the procedure is not to resolve factual issues, but to determine if there are genuine issues of fact to be tried. *Lashlee v. Sumner,* 570 F.2d 107, 111 (6th Cir. 1978). Summary judgment, therefore, will not lie if the dispute about a material fact is genuine, "that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

In a motion for summary judgment, the moving party bears the "burden of showing the absence of a genuine issue as to any material fact, and for these purposes, the [evidence submitted] must be viewed in the light most favorable to the opposing party." *Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 157, 90 S.Ct. 1598, 1608, 26 L.Ed.2d 142 (1970); *accord Adams v. Union Carbide Corp.,* 737 F.2d 1453, 1455–1456 (6th Cir.1984). The moving party is entitled to summary judgment "where it is quite clear what the truth is and where there are no unexplained gaps in documents submitted by the moving party pertinent to material issues of fact." *Poller v. Columbia Broadcasting System, Inc.,* 368 U.S. 464, 467, 82 S.Ct. 486, 488, 7 L.Ed.2d 458 (1962); *accord County of Oakland v. Berkley,* 742 F.2d 289, 297 (6th Cir.1984); *Adickes,* 398 U.S. at 157–60, 90 S.Ct. at 1608–10; *Smith v. Hudson,* 600 F.2d 60, 65 (6th Cir.), *cert. dismissed,* 444 U.S. 986, 100 S.Ct. 495, 62 L.Ed.2d 415 (1979).

If the moving party meets its burden and if adequate time for discovery has been provided, the opposing party is required to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof as well. *Celotex Corp. v. Catrett,* 477 U.S. 317, 326, 106 S.Ct. 2548, 2554, 91 L.Ed.2d 265 (1986). The mere existence of a scintilla of evidence in support of the opposing party's motion will be insufficient; plaintiff "must set forth *specific facts* showing that there is a genuine issue for trial." *Davis v. Robbs,* 794 F.2d 1129, 1130 (6th Cir.1986) (emphasis in original). As is provided in Fed.R.Civ.P. 56(e):

> When a motion for summary judgment is made and supported as provided in this rule, an adverse party may not rest upon the mere allegations or denials of his pleading, but his response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial. If he does not so respond, summary judgment, if appropriate, shall be entered against him.

Therefore, a party may not rest on the allegations contained in his pleadings to overcome a properly supported motion for summary judgment. *First National Bank v. Cities Service Co.*, 391 U.S. 253, 259, 88 S.Ct. 1575, 1577, 20 L.Ed.2d 569 (1968) (footnote omitted).

Before a ruling on a motion for summary judgment can be made, the dispositive issues and factual inquiries relevant to the motion must be clearly delineated. With this standard in mind, the Court will proceed to consideration of the pending motion.

### III. Facts

Plaintiff Harris, is as noted above, a black male, and was, until January 31, 1985, a full-time teacher, under a continuing contract with defendant CBOE. Amended Complaint ¶ 19. He had worked for CBOE for a period of fifteen years, and had continuously been engaged in the profession of teaching for a total of forty-one years. At the time of his separation with the Columbus City Schools he was sixty-nine years of age. Amended Complaint ¶ 18. He is certified to teach in the areas of biological science, physical education, drivers education and general science with the State of Ohio. Amended Complaint ¶ 20.

Plaintiff Harris alleges that defendants "sought by way of suggestion, innuendo, and comment to induce him to take early retirement" and when it became clear that he would not retire voluntarily used the "special evaluation" procedure in § 401.03 to obtain the same result. Amended Complaint ¶ 20.[1] Harris contends that the special evaluation procedure was invoked by defendants in retaliation for his filing a complaint with the Ohio Civil Rights Commission, Charge No. 052834079, which was based on plaintiff's non-selection for and/or promotion to the position of "Faculty Advisor/Athletic Director", in favor of a youthful (under 35) white female, and plaintiff's non-reassignment to teach biolo-

gy classes for the 1983 school year in favor of a younger white male, when he had greater seniority and experience than both selectees. Amended Complaint ¶ 23. Following his separation from the employ of defendants, Plaintiff Harris filed a second Ohio Civil Rights Commission complaint, Charge No. 0528535887, in which he realleged the substance of the first complaint and further alleged forced resignation and/or constructive discharge. In addition, Harris alleged that the special evaluation was the culmination of a "campaign of harassment" against him by CBOE, evidenced by: its denial of a previously approved request to take students on a biological and cultural exchange trip to the Bahamas; the reluctance of South High School, particularly Principal O'Leary, to promote Black History Month; the absolute refusal of defendant Hyre to meet with him, despite plaintiff's repeated attempts, even though Hyre would regularly see white employees; the "severe verbal abuse" of defendant Cunningham directed at plaintiff in contravention of sections 404.02, 404.06, and 404.07 of the CBA; the denial of supplemental contracts to plaintiff when such contracts were regularly given to white, younger, and non-handicapped teachers; the preemptory scheduling for a physical examination by the defendant Board's physician; and, finally, the special evaluation in which he was rated unsatisfactory in four areas when he had previously received a satisfactory regular evaluation just six months earlier.

Defendants contend that Plaintiff Harris was subjected to special evaluation solely because health related concerns. South High School Principal O'Leary testified that "to oversimplify things, the only reason Mr. Harris was under scrutiny was because of the fact that we felt the man was not up to the standards that he previously possessed." O'Leary Depos. at 126. Mr. O'Leary's deposition presents a picture of Mr. Harris as a teacher, who because of

---

**1.** The Amended Complaint contained allegations that § 401.03 was unconstitutional on its face, and as applied to plaintiffs. However, this Court found that section 401.03 of the collective bargaining agreement was neither unconstitutional on its face nor as applied. Opinion and Order, March 6, 1989, at 8–9.

health reasons, was no longer able to teach. For example, there were allegations that Harris had been observed by other teachers and students as being asleep during class. *Id.* at 10. O'Leary admitted that both students who accused Harris of sleeping were receiving failing grades in his class. *Id.* at 114. There were also accusations that Harris did not know the material he was teaching, *Id.* at 69, that he was teaching the same material day after day, *Id.* at 67, and that he would become confused and take roll more than once during a class period. *Id.* at 79. However, O'Leary conceded that during his personal observation of Harris's class "I didn't see him sleeping ... he was alert and lucid and all those good things...." *Id.* at 47–48. O'Leary also admitted that Harris was a "sentry" and was doing a good job in enforcing the rules regarding hall-passes. *Id.* 92.

With regard to the other allegations in the Amended Complaint, O'Leary testified that he was aware that Harris had filed civil rights complaints but that fact was not the basis for the invocation of the special evaluation. O'Leary Depos. at 11. He further testified that Harris was not scheduled to teach biology because, due to certificate requirements, to allow Harris to teach biology other teachers would have to have been fired in violation of the CBA. *Id.* at 22–25 and 65. Harris disputes that any reasons for his reassignment were ever given. Harris Interog. ¶ 32(e). O'Leary also stated that Harris was not allowed to take the biological and cultural exchange trip to the Bahamas because Harris failed to follow school policy regarding field trips and because the school became increasingly concerned of potential liability arising from field trips during the time period at issue. *Id.* at 12–13. He also noted that during that time, he did not authorize any school-sponsored international field trips. *Id.* at 51. Finally, Mr. O'Leary testified that Harris's application to become Athletic Director followed closely after O'Leary received a letter from Dr. Moshe Viz, Department of Otolaryngology, Central Ohio Medical Group, indicating that Harris was suffering from voice strain and should be given lighter duties. O'Leary stated that he sought such a position for Harris without success. He also noted, however, that the position of Athletic Director is a "highly visible, strenuous, tough assignment and I wouldn't make an assignment strictly based on somebody that couldn't speak well." *Id.* at 40. Additionally, O'Leary stated that by the time Harris applied for the position it had already been filled. *Id.*

Defendant Cunningham testified on deposition that "Mr. Harris was not the most cooperative person in dealing with procedures," Cunningham Depos. at 33, and "when you dealt with Mr. Harris, you knew you were going to be in some kind of legal confrontation and so you dotted the I's and crossed the T's." *Id.* at 44. Mr. Cunningham noted that Harris's June 4, 1984 evaluation and all prior evaluations were successful. *Id.* at 50–59. Cunningham stated that "I knew [Mr. Harris] had a serious health problem." *Id.* at 33, and "I was adamant ... that he could not return to school until he had clearance from our school physician." *Id.* at 60. Finally, Cunningham testified that he was surprised by Harris's letter of resignation because Harris was "not a quitter." *Id.* at 62.

Plaintiff Baldwin, a black female, was a full-time teacher, under a limited contract, with the defendant CBOE until April 17, 1984. Amended Complaint ¶ 41. She was employed as a physical education instructor at Starling Middle School. Plaintiff Baldwin was, and is, certified by the State of Ohio to teach physical education under a provisional certificate. Amended Complaint ¶ 42.

Plaintiff Baldwin alleges that she was subjected to a special evaluation procedure initiated by Starling Middle School Principal Voyles on January 24, 1984. She avers that prior to the special evaluation, she had never been reprimanded, disciplined, or counselled by defendants for any breach of the terms and conditions of her employment. She further alleges that in a regular evaluation in June 1983 she was found to be satisfactory in all respects. Amended Complaint ¶ 47. Voyles became the Princi-

pal of Starling Middle School in August 1984.

Ms. Baldwin alleges that defendant Cunningham misrepresented to plaintiff that if she would resign "quietly", she would be rehired after she had taken certain additional courses at Ohio State University. However, after plaintiff successfully completed the contemplated courses, defendant Cunningham then refused to rehire her. Plaintiff alleges that this constituted deceit, breach of promise, misrepresentation, and fraudulent inducement. Amended Complaint ¶ 54. Cunningham denies that he made such a promise. He further contends that Baldwin submitted a letter of resignation on the advise of counsel. Cunningham Depos. at 135.

Plaintiff Baldwin, in answers to interrogatories, offers several examples of discriminatory practices employed by defendants. She contends that the special evaluation was used to non-renew her contract, when in other situations the process was used to "aid teachers to transfer into another area if problems had occurred." Baldwin Interog. ¶ 14 and Appendix A. She further contends that Voyles "used vulgar and discriminatory language against me which indicated that he was racially motivated in firing me" and "continued to discriminate against me by making physical advances which were turned away and thereafter, became very diligent with regard to any student-teacher problem, including statements that he would 'damage my career.' " Id. Ms. Baldwin also maintains that other white teachers were allowed to either transfer or were not disciplined for serious misconduct. She notes that one white teacher was not disciplined for biting a student and another white teacher was not forced to undergo a special evaluation when he molested a female sixth grade student. Id.[2]

Defendants allege that the special evaluation was instituted because of problems with Plaintiff Baldwin's performance. Specifically, defendant Voyles indicated the special evaluation procedure was undertaken because "a number of things had occurred that were unacceptable in terms of the performance of teaching, classroom management skills and insubordination...." Voyles Depos. at 12. Voyles testified that Ms. Baldwin probably satisfied 65% of the Board required teaching objectives for her classes. Id. at 20. He additionally testified that she was reprimanded for swearing at students, Id. at 24, and for reporting late to work. Id. at 28. Voyles also stated that if Ms. Baldwin "gets mad she becomes overbearing, belligerent, nasty and a few other things." Voyles Depos. at 79. Voyles stated that he thought special evaluation was to help the teacher improve teaching skills. Id. at 51.

Plaintiff Harris brought this action after exhausting administrative remedies. However, Plaintiff Baldwin has not submitted evidence that she has pursued any administrative remedies.

## IV.   Law and Analysis

### A.   The Civil Rights Act of 1991

■   Although the parties have not argued or briefed the issue of whether or not the provisions of the Civil Rights Act of 1991 [hereinafter the "1991 Act" or "Act"] should apply to this case, at least some discussion of this important issue is warranted here. On November 21, 1991 President Bush signed into law the 1991 Act which strengthens the federal discrimination law and provides new procedural rights and remedies.

The operative question here is whether or not the provisions of the 1991 Act can be retroactively applied to a pending action. The answer to this question begins with a reading of "the language of the statute itself. Absent a clearly expressed legislative intention to the contrary, that language must ordinarily be regarded as conclusive." *Kaiser Aluminum & Chemical Corp. v. Bonjorno*, 494 U.S. 827, 835, 110 S.Ct. 1570, 1575, 108 L.Ed.2d 842 (1990),

---

**2.** Principal Voyles indicated in his deposition that the teacher accused of child molestation resigned before the school or the school board took action against him. Voyles Depos. at 81–83.

(quoting *Consumer Product Safety Comm'n v. GTE Sylvania, Inc.*, 447 U.S. 102, 108, 100 S.Ct. 2051, 2056, 64 L.Ed.2d 766 (1980)). The judiciary is required to follow the mandate set forth by Congress, because "where the congressional intent is clear, it governs." *Bonjorno*, 494 U.S. at 837, 110 S.Ct. at 1577.

Unfortunately, the language in the 1991 Act does not offer clear instruction regarding retroactive or prospective application of its provisions. The lack of guidance provided by Congress has caused a split among the courts which have considered the question of the retroactive application of the Act. See, *Craig v. Ohio Department of Administrative Services*, 790 F.Supp. 758, 768 and n. 6 (S.D.Ohio 1992) (Kinneary, J.) (collecting cases and noting that of forty-eight opinions interpreting provisions of the 1991 Act thirty have held that the various components of the Act apply prospectively only.) One district judge has observed that congress "punted on the question" of retroactivity. *King v. Shelby Medical Center*, 779 F.Supp. 157 (N.D.Ala.1991) (Acker, J.). J. Stephen Poor, writing in the National Law Journal, described the Act as a "compromise ... [which] may be less a reasoned attack on the problems perceived by its proponents and more a desire for the political benefits of the passage of some civil rights legislation" with provisions which are "remarkably vague—a vessel into which each party can pour its own interpretations." J. Stephen Poor, *Rights Act's Retroactivity Still Disputed*, National Law Journal, January 27, 1992, at 19.

The major section dealing with the effective date of the statute is § 402, which provides:

(a) In General.—Except as otherwise specifically provided, this Act and the amendments made by this Act shall take effect upon enactment.

(b) Certain Disparate Impact Cases.— Notwithstanding any other provision of this Act, nothing in this Act shall apply to any disparate impact case for which a complaint was filed before March 1, 1975, and for which an initial decision was rendered after October 30, 1983.

Subsection (a) provides no guidance as to the applicability of the amendments to pending cases. Subsection (b) was inserted at the insistence of the Senators from Alaska, to insure that the provisions of the 1991 Act concerning disparate impact cases did not apply to Wards Cove Packing Co., the defendant in *Wards Cove Packing Co. v. Atonio*, 490 U.S. 642, 109 S.Ct. 2115, 104 L.Ed.2d 733 (1989). *See* 137 Cong.Rec. S15953, S15963 (Daily ed. Nov. 5, 1991) (Statements of Sen. Murkowski and Sen. Kennedy).

Like the language of the Act itself, the legislative history provides little useful guidance concerning the application of the new provisions to pending cases. One of the sponsors of the bill, Senator Danforth, signed an interpretive memorandum indicating that the 1991 Act "will not apply to cases arising before the effective date of the Act", 137 Cong.Rec. S15478 (Daily ed. Oct. 30, 1991), and that the Act "shall not [be] appl[ied] retroactively." *Sponsors' Interpretive Memorandum*, 137 Cong.Rec. S15485 (Daily ed. Oct. 30, 1991). The other major sponsor of the bill, Senator Kennedy, stated that "there is disagreement among the supporters of the bill regarding this issue (application of the 1991 Act to pending cases).... In my view, these restorations[3] apply to pending cases." 137 Cong. Rec. S15963 (Daily ed. Nov. 5, 1991). These diametrically opposed interpretations by the Act's co-sponsors are indicative of both the compromise nature of the Act and the lack of a clear congressional mandate towards retroactive application of the new law.

Further support for the contention that Congress had no express intent regarding retroactivity may be inferred from the language in the Civil Rights Act of 1990, which was vetoed by President Bush. Section 15(a)(4) of that bill, titled "Application

---

**3.** Senator Kennedy refers to provisions in the 1991 Act that legislatively alter several United States Supreme Court decisions.

of Amendments and Transition Rules," provided that

> section 8 [providing for jury trials, compensatory and punitive damages in employment discrimination cases dealing solely with intentional discrimination] *shall apply to all proceedings pending on or commenced after the date of the enactment of this Act.* (emphasis added)

Language expressly mandating retroactive application of the statute thus existed in the Civil Rights Act of 1990; such express language is noticeably lacking in the 1991 Act. The absence of such unambiguous language in the 1991 Act suggests that Congress either meant to apply the Act's provisions prospectively, or chose to remain silent on the issue. The most that can be said is that Congress evidenced no unified position on the issue. Since there is no express congressional directive on this issue, it is necessary to resort to judicially created rules of statutory construction.

Generally, the United States Supreme Court has delineated two paths to follow regarding the retroactivity of legislation in the absence of clear congressional intent. One line of cases, represented by *Bradley v. Richmond School Board,* 416 U.S. 696, 94 S.Ct. 2006, 40 L.Ed.2d 476 (1974), holds that retroactivity is presumed when congressional intent is unknown. The other view is that, where Congress is silent on the issue, prospective application of the statute is presumed. *Bowen v. Georgetown University Hospital,* 488 U.S. 204, 109 S.Ct. 468, 102 L.Ed.2d 493 (1988). The Supreme Court itself has noted the "apparent tension" between the two lines of cases, but most recently reaffirmed "the generally accepted axiom that '[r]etroactivity is not favored in the law.... [C]ongressional enactments and administrative rules will not be construed to have retroactive effect unless their language requires this result.'" *Bonjorno,* 494 U.S. at 837, 110 S.Ct. at 1577 (quoting *Bowen,* 488 U.S. at 208, 109 S.Ct. at 471).

The United States Court of Appeals for the Sixth Circuit has attempted to reconcile the *Bradley* and *Bowen* lines of authority by applying the *Bradley* rule, presuming retroactive effect, to statutory provisions involving procedural rights, and by following the *Bowen* rule, presuming prospective application, to statutory provisions implicating substantive rights. *See United States v. Murphy,* 937 F.2d 1032 (6th Cir. 1991). *See also Boddie v. American Broadcasting Companies, Inc.,* 881 F.2d 267, 269–270 (6th Cir.1989), *cert. denied,* 493 U.S. 1028, 110 S.Ct. 737, 107 L.Ed.2d 755 (1989), (quoting *United States v. Security Industrial Bank,* 459 U.S. 70, 79, 103 S.Ct. 407, 413, 74 L.Ed.2d 235 (1982)). The *Bradley* exception, as thus narrowly construed, "comports with [the] venerable rule of statutory construction, *i.e.,* that statutes affecting substantive rights and liabilities are presumed to have only prospective effect." *Bennett v. New Jersey,* 470 U.S. 632, 639, 105 S.Ct. 1555, 1560, 84 L.Ed.2d 572 (1985); *accord United States v. Security Industrial Bank,* 459 U.S. 70, 103 S.Ct. 407, 74 L.Ed.2d 235 (1982); *Greene v. United States,* 376 U.S. 149, 84 S.Ct. 615, 11 L.Ed.2d 576 (1964); *United States v. Murphy,* 937 F.2d 1032; *Boddie v. American Broadcasting Companies, Inc.,* 881 F.2d 267.

There are several strong policy arguments in favor of retroactive application of the Act. For example, the Act was designed to reestablish and restore prior interpretations of the law in question. Virtually every court that has considered the matter has held that the Civil rights Restoration Act of 1987 (which overruled *Grove City College v. Bell,* 465 U.S. 555, 104 S.Ct. 1211, 79 L.Ed.2d 516 (1984)) applied to cases pending at the time of its enactment. *See e.g. Ayers v. Allain,* 893 F.2d 732, 754–55 (5th Cir.) *vacated on other grounds* 914 F.2d 676 (5th Cir.1990) (*en banc*), *cert. granted on other grounds,* —— U.S. ——, 111 S.Ct. 1579, 113 L.Ed.2d 644 (1991). Another strong policy against retroactivity—reliance by the defendant that the conduct was lawful at the time it was committed—is noticeably absent in this case. Where, as here, the alleged discriminatory action occurred before the decision in *Patterson,* and was arguably unlawful under then prevailing § 1981 case law, an employer could

not advance a reliance argument.[4] The Court notes these arguments to acknowledge that the question of legislative retroactivity is an often difficult and confusing area of law. However, due to the precedent established both by the Sixth Circuit and this court discussed below, these policy considerations carry little weight in the resolution of the retroactivity question here.

Recently, in *Vogel v. City of Cincinnati*, 959 F.2d 594 (6th Cir.1992), the Sixth Circuit held that because retroactive application of the Act in a § 1981 case would affect substantive rights and liabilities, *Bowen* required prospective application. Judge Ryan, concurring in part and dissenting in part, declined to join the court's holding that the Act does not apply retroactively because he felt it improper to "pass upon the very significant question [of the Act's retroactivity] without full briefing and proper submission of the issue." *Id.* Despite the fact that the issue of the Act's retroactivity was not raised, briefed or argued by the parties, *Vogel* provides persuasive authority that the Act will be held to be apply prospectively in this Circuit.

Three judges of this Court have held various provisions of the Act to apply prospectively only. The *Craig, supra,* court held that the Act could not be applied retroactively to allow a plaintiff to assert a § 1981 claim previously barred by the Supreme Court's holding in *Patterson.* Similarly, in *Kaiser v. Buckeye Youth Center*, C–2–89–1036 (S.D.Ohio April 15, 1992) (Abel, M.J.), the court held that 1991 Act could not resurrect a § 1981 claim in an employment discrimination suit. Further, in *Johnson v. Rice*, No. 2:85–CV–1318, 1992 WL 16284 (S.D.Ohio January 24, 1992) (King, M.J.), the court held that claims for compensatory damages and a demand for trial by jury could not be applied retroactively to a pending Title VII action. The reasoning of these prior decisions is persuasive. Accordingly, based upon these prior decisions and the Court's own research and analysis, the Court finds that

the Act cannot be construed to apply retroactively to this action.

■ This holding, finding the Act has only prospective application, is bolstered by the public pronouncements of the EEOC, the administrative agency responsible for the enforcement of the 1991 Act. As a general proposition, policy guidelines issued by the agency responsible for enforcing a statute are entitled to deference. *See Young v. Community Nutrition Institute,* 476 U.S. 974, 106 S.Ct. 2360, 90 L.Ed.2d 959 (1986); *Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.,* 467 U.S. 837, 843, 104 S.Ct. 2778, 2781, 81 L.Ed.2d 694 (1984); *Taylor v. United States,* 848 F.2d 715, 718 (6th Cir. 1988); *United States v. Colahan,* 811 F.2d 287, 290 (6th Cir.), *cert. denied,* 484 U.S. 818, 108 S.Ct. 73, 98 L.Ed.2d 36 (1987). The same holds true for positions taken by the EEOC, as the primary enforcement agency for Title VII. *See EEOC v. Commercial Office Products Co.,* 486 U.S. 107, 115–16, 108 S.Ct. 1666, 1671–72, 100 L.Ed.2d 96 (1988); *Oscar Mayer & Co. v. Evans,* 441 U.S. 750, 761, 99 S.Ct. 2066, 2074, 60 L.Ed.2d 609 (1979); *General Electric Co. v. Gilbert,* 429 U.S. 125, 97 S.Ct. 401, 50 L.Ed.2d 343 (1976). While official statements made by the administrative agency during the course of litigation are suspect, *see Bowen v. Georgetown University Hospital,* 488 U.S. 204, 212, 109 S.Ct. 468, 473, 102 L.Ed.2d 493 (1988) ("deference to what appears to be nothing more than an agency's convenient litigating position would be entirely inappropriate." *Id.* at 213, 109 S.Ct. at 474), such caution is not warranted here where the EEOC's position is unrelated to any particular litigation. *Id.* The EEOC has issued policy guidelines interpreting the 1991 Act's new damages provisions to apply prospectively, and only to discriminatory conduct which occurred after the 1991 Act's effective date, November 21, 1991. *See* Daily Lab.Rep. (BNA), January 2, 1992.

Based on these considerations, the Court finds that the 1991 Act should not be applied retroactively to this case. According-

---

**4.** *See infra* pp. 1342–43.

ly, the pre-November 21, 1991 statutory and case law will govern this action.

### B. *42 U.S.C. §§ 1981 and 1983*

#### 1. *Statute of Limitations*

■ Defendants argue that plaintiffs' §§ 1981 and 1983 claims are barred by the one-year statute of limitations for personal injury actions under Ohio Revised Code § 2305.11, citing *Demery v. City of Youngstown,* 818 F.2d 1257 (6th Cir.1987) (§ 1981 claims subject to one year statute of limitations). Plaintiffs concede that the §§ 1981 and 1983 claims are time-barred, citing *Mulligan v. Hazard,* 777 F.2d 340 (6th Cir.1985), *cert. denied,* 476 U.S. 1174, 106 S.Ct. 2902, 90 L.Ed.2d 988 (1986) (§ 1983 claims subject to one year statute of limitations). The Court observes, however, that *Mulligan,* and by implication the statute of limitations holding in *Demery,* have been overruled by later case law.

The confusion surrounding the relevant limitations periods on federally created causes of action which borrow state limitations law is understandable. In *Wilson v. Garcia,* 471 U.S. 261, 105 S.Ct. 1938, 85 L.Ed.2d 254 (1985), the Supreme Court directed federal courts to apply each state's statute of limitations governing personal injuries to § 1983 actions. Thereafter, in *Mulligan v. Hazard,* 777 F.2d 340, 344, one panel of the Sixth Circuit concluded that "*Wilson* implicitly mandates that its holding be applied retroactively." Accordingly, noting that Ohio law then provided both a one-year statute of limitations for intentional torts and a two-year statute of limitations governing bodily injury, Ohio Rev. Code § 2305.10, .11, the court adopted the one-year statute of limitations for § 1983 actions, finding it more appropriate for actions arising under the civil rights statutes. Accordingly, based on *Wilson* and *Mulligan,* the Sixth Circuit employed a one-year statute of limitations for § 1983 actions in Ohio. *See, e.g., Thomas v. Shipka,* 818 F.2d 496 (6th Cir.1987), *clarified on reh'g,* 829 F.2d 570 (6th Cir.1987), *vacated and remanded,* 488 U.S. 1036, 109 S.Ct. 859, 102 L.Ed.2d 984 (1989), *vacated and remanded,* 872 F.2d 772 (6th Cir.1989).

Then, in *Demery v. Youngstown,* 818 F.2d 1257 (6th Cir.1987), the Sixth Circuit joined the majority of circuits that had confronted the issue and found that *Wilson's* directive to apply each state's personal injury statute of limitations in § 1983 actions applies equally to § 1981 actions. Accordingly, the *Demery* Court determined that the one-year limitation period that was found retroactively applicable to § 1983 actions in *Mulligan* applied equally and retroactively to § 1981 actions. 818 F.2d at 1261.

■ This did not end the confusion, however, because another panel in the Sixth Circuit found that § 1983 actions arising in Michigan were governed by that state's residual three-year statute of limitations governing personal injury claims as opposed to two different, more specific statutes of limitations applicable to personal injuries. See *Carroll v. Wilkerson,* 782 F.2d 44 (6th Cir.) (per curiam), *cert. denied sub nom. Wayne v. Carroll,* 479 U.S. 923, 107 S.Ct. 330, 93 L.Ed.2d 302 (1986). In an *en banc* case, *Browning v. Pendleton,* 869 F.2d 989 (6th Cir.1989), with the benefit of the Supreme Court's opinion in *Owens v. Okure,* 488 U.S. 235, 109 S.Ct. 573, 102 L.Ed.2d 594 (1989), the question was finally laid to rest. In *Owens,* the Supreme Court closed the gap left open in *Wilson* by proclaiming that when state law provides for more than one statute of limitations for personal injury actions, § 1983 actions should be subjected to the state's general or residual personal injury statute of limitations and not any statute of limitations governing specific intentional torts. Accordingly, as the Sixth Circuit held in *Browning,* the proper statute of limitations governing § 1983 actions arising in Ohio is two years. Ohio Rev.Code Ann. § 2305.10; *Browning,* 869 F.2d at 992. Likewise, § 1981 actions arising in Ohio also are subject to the two-year statute of limitations. *Demery,* 818 F.2d 1257. Accordingly, the contrary holding in *Mulligan* was expressly overruled. *Browning,* 869 F.2d at 992. Based on the foregoing discussion, the Court holds that the applicable limitations period involved in this action is two years. *Id.* at 989.

Applied to the case at bar, these principles reveal that Plaintiff Harris's claims are not time barred. The Supreme Court in *Wilson* and the Sixth Circuit in *Browning, Mulligan,* and *Demery,* have held that judicial opinions which change the applicable statute of limitations apply retroactively. Accordingly, the appropriate limitations period in this instance is two years. Harris alleges he was constructively discharged on January 31, 1985. The complaint was filed on July 28, 1986, less than two years after the alleged violations occurred. However, Plaintiff Baldwin's §§ 1981 and 1983 claims are barred by the two year limitations period. She alleges she was constructively discharged on April 17, 1984. She was not added to the suit as a party-plaintiff until almost three years later upon the filing of the Amended Complaint on March 27, 1987. Accordingly, Plaintiff Baldwin's §§ 1981 and 1983 claims are DISMISSED.

### 2. *Plaintiff Harris's § 1981 Claim*

Despite crossing the hurdle imposed by the statute of limitations, Plaintiff Harris's § 1981 claim nevertheless contains a fatal defect. The salient feature of § 1981 is the restriction of its scope to forbidding discrimination in the making and enforcement of contracts alone. It reads, in pertinent part:

All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of person and property as is enjoyed by white citizens....

The gist of Plaintiff Harris's claims is that his alleged constructive discharge under CBOE's special evaluation procedure policy was racially motivated. For the reasons set forth in *Patterson v. McLean Credit Union,* 491 U.S. 164, 109 S.Ct. 2363, 105 L.Ed.2d 132 (1989), we find that plaintiff's constructive discharge claim under § 1981 must fail.

In *Patterson,* a black woman was employed by the respondent employer for ten years. When she was laid off, she brought suit pursuant to § 1981 alleging that she had been discharged because of her race. In affirming the District Court's finding that an alleged discriminatory dismissal is not actionable under § 1981, the Supreme Court noted the limited relief which may be sought under the section. "Section 1981 cannot be construed as a general proscription of racial discrimination in all aspects of contract relations, for it expressly prohibits discrimination *only in the making and enforcement of contracts.*" *Patterson,* 491 U.S. at 176, 109 S.Ct. at 2372 (emphasis added).

The Court expressly stated that the protection § 1981 affords to the creation of contracts does not extend to problems that may arise later in the conditions of continued employment. *Id.* "Such post formation conduct," the Court said, "does not involve the right to make a contract, but rather implicates the performance of established contract obligations and the conditions of continued employment, *matters more naturally governed by state contract law and Title VII.*" *Id.* at 151 (emphasis added). Furthermore, the Court held that the protection § 1981 affords to the enforcement of contracts only relates to the legal process of enforcing contract rights. *Id.*

Even if we assume that defendants discharged plaintiff for purely discriminatory reasons, it still would not amount to a cause of action under § 1981. "This type of conduct, reprehensible though it be if true, is not actionable under § 1981, which covers only conduct at the initial formation of the contract and conduct which impairs the right to enforce contractual obligations through the legal process." *Id.* at 152.

In the instant case, plaintiff Harris has alleged no facts that indicate defendants have impaired his right to enter into employment contracts.[5] Nor has plaintiff

---

**5.** Harris asserts a claim that CBOE discriminated against him by failing to hire him as athletic director and denying him other supplemental duties, such as coaching. These claims are foreclosed by *Patterson* and later case law. The Supreme Court left open the question as to

asserted that defendants have inhibited them from enforcing their contract rights. Plaintiffs' only claims involve their alleged racially motivated constructive discharge. The Sixth Circuit has held, in light of *Patterson,* that a claim of racial harassment based on allegations that the complaining black employee was treated differently from whites is outside the scope of § 1981. *W.T. Becton v. Burlington Northern R.R. Co.,* No. 86–6136, slip op. 878 F.2d 1436 (table) (6th Cir.1989); *See also Risinger v. Ohio Bureau of Workers' Comp.,* 883 F.2d 475 (6th Cir.1989).

Based on the factors set out above, plaintiffs' § 1981 claims are hereby DISMISSED.

### 3. *Plaintiff Harris's § 1983 Claim*

■ To state a claim under § 1983, Plaintiff Harris must show that the defendant acted under the color of state law and that the defendant deprived the plaintiff of a federal right, either statutory or constitutional. *Bacon v. Patera,* 772 F.2d 259, 263 (6th Cir.1985), *citing Gomez v. Toledo,* 446 U.S. 635, 100 S.Ct. 1920, 64 L.Ed.2d 572 (1980). There is no dispute that the individual defendants and CBOE were acting under color of state law. However, there is a question as to whether or not Harris was denied a federal right.

The Amended Complaint alleges that:
[H]e had a "property interest", protectable at law, in his continued employment, and that the defendants O'Leary, and Cunningham, conspired to deprive him of that property interest, and did so, under color of state law, contrary to the provisions of 42 U.S.C. 1981 and 1983 ... and that defendant Hyre, through conni-

vance, acquiescence, condonation, and/or ratification and sanction, is equally liable for the wrongful acts of his subordinates....

Amended Complaint ¶ 27.

■ Typically constitutional equal protection claims arise in the context of legislative enactments; i.e., whether legislation denies plaintiff equal protection of the laws. Here, Harris claims bureaucratic action denied him equal protection of the law. The Sixth Circuit has not taken a position on whether § 1983 is an appropriate mechanism to challenge simple bureaucratic action. *See, Pendleton v. Jefferson Local School District Bd. of Educ.,* No. 91–3126, 958 F.2d 372 (Table), 1992 WL 57421, *9, 1992 U.S.App. LEXIS 6294, *24, 58 Fair Empl.Prac.Cas. (BNA) 528 [958 F.2d 372 (Table) ] (6th Cir. March 25, 1992). Plaintiff Harris makes an allegation of handicapped discrimination under § 1983. Harris describes his handicap as dysphonia or voice strain. Although claims of handicapped discrimination are normally brought under the Rehabilitation Act of 1973, the Act does not preempt a cause of action brought under § 1983. *Pendleton, supra,* 958 F.2d 372; *Rothschild v. Grottenthaler,* 716 F.Supp. 796, 801 (S.D.N.Y.1989); *contra Tyus v. Ohio Dept. of Youth Services,* 606 F.Supp. 239 (S.D.Ohio 1985).

■ Under *City of Cleburne v. Cleburne Living Center,* 473 U.S. 432, 445–46, 105 S.Ct. 3249, 3257–58, 87 L.Ed.2d 313 (1985), and its progeny, people with handicaps do not constitute a suspect class protected by the exacting "strict scrutiny" standard of judicial review. Rather, actions affecting people with handicaps are subject to the more deferential "rational

---

how promotions fit within the statutory scheme of § 1981, but stated: "[T]he question of whether a promotion claim is actionable under § 1981 depends upon whether the nature of the change in position was such that it involved the opportunity to enter into a new contract." *Patterson,* 491 U.S. at 185, 109 S.Ct. at 2377. Here, a transfer to the position of athletic director or a supplemental contract would not have created the "new" contractual relationship contemplated in *Patterson.* In either situation, the relationship between the parties would still be covered by the CBA entered into between CEA and

CBOE. The situation here is clearly dissimilar to that in *Hishon v. King & Spalding,* 467 U.S. 69, 104 S.Ct. 2229, 81 L.Ed.2d 59 (1984) cited in by the Supreme Court in *Patterson* as an example of "a new and distinct relation." *Hishon* involved the refusal of a law firm to accept an associate into partnership. Such a change would constitute a new contractual relationship because the individual would have gone from an employee to an owner of the firm. These circumstances are simply not present in this case.

basis" standard. Under this test, in order for the defendants' actions concerning Harris to withstand an equal protection review, they need only be "rationally related to a legitimate governmental purpose." *Lussier v. Dugger,* 904 F.2d 661, 671 (11th Cir. 1990). Here, there is uncontroverted evidence of defendants' concern for Harris's health and for his over-all teaching performance. Their duty to the school and the students established a legitimate nondiscriminatory reason to cause Mr. Harris to be medically evaluated for his dsyphonia and other medical conditions. Harris stated that he "suffers from diabetes, dysphonia, and heart related problems" in charge 052853587 before the Ohio Civil Rights Commission. The fact that Plaintiff Harris suffered from these ailments and had allegedly used almost his entire sick-leave allowance is clearly a legitimate reason to require Harris to be examined by a physician retained by CBOE.

Based on the foregoing discussion, the Court concludes that Plaintiff Harris's § 1983 claim based on discrimination based on his handicap must be DISMISSED.

In regard to Plaintiff Harris's § 1983 claim based on racial discrimination the Court finds that a question of material fact exists precluding summary judgment. In this Court's March 6, 1989 Opinion and Order we observed that "there being insufficient evidence before the Court at this time, it cannot be determined whether plaintiff Harris' resignation was voluntary or involuntary." Order at 8. In the intervening three years this issue has become no clearer. As we note in the section concerning Harris's Title VII claims, genuine questions of material fact exist regarding whether Harris was impermissibly discriminated against on account of his race. Accordingly, defendants are not entitled to summary judgment on this claim.

### C. 42 U.S.C. §§ 1985 and 1986

The elements for a cause of action under § 1985(3) are:

1 the existence of a conspiracy of two or more persons;

2 the purpose of the conspiracy is to deprive a person or a class of persons of equal protection of the laws or privileges and immunities under the laws;

3 an act in furtherance of the conspiracy; and

4 injury or deprivation of rights of the plaintiff.

*Cameron v. Brock,* 473 F.2d 608, 610 (6th Cir.1973).

Section 1985 does not contain a statute of limitations. Therefore, courts have borrowed the applicable state created limitations for actions brought under § 1985 just as they have for § 1981 and 1983 actions. *Amsler v. Smith–Lustig Paper Box Mfg. Co.,* 908 F.2d 972 (6th Cir. 1990) (unpublished opinion); *Sevier v. Turner,* 742 F.2d 262 (6th Cir.1984). Accordingly, the limitations period for § 1985 actions is two years as provided in O.R.C. § 2305.10. Accordingly, for the reasons applicable to plaintiffs' § 1981 and 1983 claims, plaintiff Baldwin's § 1985(3) claim is DISMISSED.

In *Hull v. Cuyahoga Valley Bd. of Ed.,* 926 F.2d 505 (6th Cir.) *cert. denied sub nom. Hull v. Schuck,* — U.S. ——, 111 S.Ct. 2917, 115 L.Ed.2d 1080 (1991), the Sixth Circuit held that the plaintiff, a black female teacher, whose nontenured contract was not renewed, had no cause of action under § 1985(3) because of the bar established by the "intracorporate conspiracy" theory. The intracorporate conspiracy theory holds that a corporation cannot conspire with its own agents or employees. *Doherty v. American Motors Corp.,* 728 F.2d 334, 339 (6th Cir.1984). It is basic in the law that you must have two persons or entities to have a conspiracy. A corporation cannot conspire with itself any more than a private individual can, and it is the general rule that the acts of the agent are the acts of the corporation. *Nelson Radio & Supply Co., Inc.,* 200 F.2d 911, 914 (5th Cir.1952), *cert. denied,* 345 U.S. 925, 73 S.Ct. 783, 97 L.Ed. 1356 (1953). The intracorporate conspiracy theory therefore bars plaintiffs' § 1985(3) claims with respect to defendants CBOE and Hyre,

Cunningham, O'Leary and Voyles insofar as the individual defendants are sued in their official capacities.

■ The Sixth Circuit did not consider in *Hull* the fact that the individual defendants were sued, as here, in both their official and individual capacities. However, in *Cole v. University of Hartford*, 391 F.Supp. 888, 893 (D.Conn.1975), the court held that "simply joining corporate officers as defendants in their individual capacities is not enough to make them persons separate from the corporation in legal contemplation. The plaintiff must also allege (and prove) that they acted other than in the normal course of their corporate duties." Here, the allegations in the Amended Complaint discloses that all actions allegedly taken by defendants were taken in the course of their official duties. According, Plaintiff Harris's § 1985 claim must be DISMISSED.

■ A violation of § 1986 requires as a necessary prerequisite a violation of § 1985. *Boddie v. American Broadcasting Companies, Inc.*, 694 F.Supp. 1304 (N.D.Ohio 1988); *Rhodes v. Mabus*, 676 F.Supp. 755 (S.D.Miss.1987). Thus, Plaintiff Harris's § 1986 claim must also be DISMISSED.

### D. *Title VII Discrimination Claim*

Both plaintiffs advance Title VII claims based on race. Plaintiff Baldwin also advances a gender based claim. Plaintiff Harris also asserts a retaliation claim. Defendants argue that plaintiffs have failed to establish a discrimination claim under Title VII regarding constructive discharge and therefore defendants are entitled to summary judgment as a matter of law. Plaintiffs maintain that summary judgment is inappropriate on the facts of this case because such intangibles as subjective feelings, good faith, motive, and intent are particularly insusceptible to the "mere mechanical process" of summary judgment, quoting *Isquith v. Middle South Utilities, Inc.*, 847 F.2d 186, 199 (5th Cir.1988).

### 1. *Plaintiff Baldwin*

■ As an initial matter, the Court observes that Plaintiff Baldwin's Title VII claims, to the extent asserted in the Amended Complaint, must fail because she did not follow the procedures mandated by the civil rights statute. A person who claims to have been discriminated against in violation of Title VII may not seek relief in federal court unless administrative remedies have first been exhausted. *Brown v. General Services Administration*, 425 U.S. 820, 96 S.Ct. 1961, 48 L.Ed.2d 402 (1976). Because there is no evidence in the record that Baldwin pursued the charges herein with the EEOC as required by law, her Title VII claim must be DISMISSED.

### 2. *Plaintiff Harris*
### a. Burdens of Proof and Production

The order, allocation, and burden of proof models for discrimination and retaliation claims are similar and are now well established. Plaintiff has the initial burden of establishing a *prima facie* case by establishing, by a preponderance of the evidence, facts which, if not explained, give rise to an inference of unlawful activity on the part of the employer. *McDonnell–Douglas Corp. v. Green*, 411 U.S. 792, 802, 93 S.Ct. 1817, 1824, 36 L.Ed.2d 668 (1973). This burden is not onerous. *Texas Dept. of Community Affairs v. Burdine*, 450 U.S. 248, 253, 101 S.Ct. 1089, 1093, 67 L.Ed.2d 207 (1981).

After the plaintiff has established a *prima facie* case of disparate treatment, the burden of production then shifts to the defendant to articulate some legitimate non-discriminatory reason for the employment action. *McDonnell–Douglas*, 411 U.S. at 802, 93 S.Ct. at 1824; *Burdine*, 450 U.S. at 253, 101 S.Ct. at 1093; *Furnco Construction Corp. v. Waters*, 438 U.S. 567, 577, 98 S.Ct. 2943, 2949, 57 L.Ed.2d 957 (1978); *Albemarle Paper Co. v. Moody*, 422 U.S. 405, 95 S.Ct. 2362, 45 L.Ed.2d 280 (1975); *Wrenn v. Gould*, 808 F.2d 493 (6th Cir.1987). The burden of persuasion, however, remains at all times with the plaintiff. *Burdine*, 450 U.S. at 256, 101 S.Ct. at 1095; *Haynes v. Miller,*

669 F.2d 1125, 1126–27 (6th Cir.1982). Accordingly, once the employer meets its burden of going forward, the burden then shifts back to the plaintiff to demonstrate, by a preponderance of the evidence, that defendant's articulated reason for the adverse action was mere pretext. *Burdine*, 450 U.S. at 254–56, 101 S.Ct. at 1094–95; *McDonnell–Douglas Corp. v. Green*, 411 U.S. at 804, 93 S.Ct. at 1825; *Wrenn*, 808 F.2d at 501; *Henry v. Lennox Inds.*, 768 F.2d 746 (6th Cir.1985); *Grano v. Department of Development of the City of Columbus*, 637 F.2d 1073 *aff'd following remand* 699 F.2d 836, 837 (6th Cir.1983).

b. Discrimination *Prima Facie* Case

When there is no direct evidence of discrimination, plaintiff bears the initial burden of establishing a *prima facie* case of discrimination. *McDonnell–Douglas Corp. v. Green*, 411 U.S. at 802, 93 S.Ct. at 1824. In order to establish a *prima facie* case of racial discrimination in a discharge case, the plaintiff must establish facts to show that:

(1) plaintiff belonged to a protected class;

(2) his job performance was satisfactory;

(3) he was terminated despite his satisfactory job performance; and

(4) he was replaced by a non-minority employee or that employees with comparable job performance were not terminated, i.e., similarly situated employees were treated differently.

See, *Mills v. Ford Motor Co.*, 800 F.2d 635 (6th Cir.1986) (citing *Grubb v. W.A. Foote Memorial Hospital*, 741 F.2d 1486, 1493 (6th Cir.1984)).

Plaintiff is, by reason of his race undoubtedly a member of a class protected by Title VII. Therefore, the first element of his *prima facie* case has been established.

Harris claims that his job performance was satisfactory and that defendants' actions were "precipitated by the filing of charges by plaintiff with the Ohio Civil Rights Commission, Charge No. 052834079," Amended Complaint ¶ 23, and part of a "campaign of harassment" against him. Amended Complaint ¶ 33.

Plaintiff points out that less than six months before the special evaluation he received a good evaluation. Harris also points to a questionnaire he wrote and distributed to three of his classes on November 18, 1984 which purports to measure student attitudes towards him as a teacher. The Court is cautious regarding the results of this survey because the fact that students may be fond of a teacher is not necessarily dispositive on the question of whether or not a teacher meets the expectations of the board of education or the school administration who are ultimately responsible for the education of students. In spite of the Court's reluctance to give much credence to plaintiff's student survey, we find that Plaintiff Harris has met the second prong of the *prima facie* case due in large part to the prior good evaluation and the fact that there is no evidence one way or the other that Harris was excessively absent.

Plaintiff Harris must prove that he was discharged despite his satisfactory job performance. In this action, the termination question turns on whether Harris resigned voluntarily, as the defendants contend, or whether he was constructively discharged. As stated above, the plaintiff's initial burden is not onerous. *Burdine*, 450 U.S. at 253, 101 S.Ct. at 1093. Attached to the Original Complaint in this action is a copy of Harris's January 29, 1985 letter of resignation. The caption on that document reads: "Letter of Forced Resignation Before Time of Real Retirement." This Court has previously stated that "it cannot be determined whether plaintiff Harris' resignation was voluntary or involuntary." Opinion and Order, March 6, 1989 at 8. In order to establish that he was constructively discharged Harris must show that the employer's conduct had the reasonably foreseeable effect of causing a reasonable person in Harris's shoes to quit. *Lynch v. Freeman*, 817 F.2d 380 (6th Cir.1987). Harris's resignation letter, combined with the circumstances alleged in the Amended Complaint, raise an inference that Harris was compelled to resign as a consequence of the defendants' conduct. Plaintiff Har-

ris has therefore satisfied the third element of the *prima facie* case.

There is no evidence in the record addressing the fourth and final element in the *McDonnell–Douglas v. Green* analysis. No party to suit has introduced evidence indicating who, if anyone, replaced Plaintiff Harris at South High School. However, this gap in the record is not fatal to Harris's Title VII claim. The *McDonnell–Douglas v. Green* analysis was "never intended to be a rigid, mechanized, or ritualistic. Rather it is merely a sensible, orderly way to evaluate the evidence in light of common experience as it bears on the critical question of discrimination." *Furnco Constr. Corp. v. Waters*, 438 U.S. 567, 577, 98 S.Ct. 2943, 2949, 57 L.Ed.2d 957 (1978). At this stage of the litigation, the Court will not require Harris to show that he was replaced by a younger, non-minority employee.

Based on the foregoing factors, the Court holds that Plaintiff Harris has established a *prima facie* case of discriminatory constructive discharge claim.

### c. Retaliation *Prima Facie* Case

Section 704(a) of the Civil Rights Act of 1964 provides that:

> It shall be an unlawful employment practice for an employer to discriminate against any of his employees or applicants for employment ... because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter.

Title VII clearly prohibits an employer from retaliating against an employee who has availed himself of his rights under the statute. *See McDonnell–Douglas Corp. v. Green*, 411 U.S. at 796, 93 S.Ct. at 1821; *Jackson v. RKO Bottlers of Toledo, Inc.*, 743 F.2d 370 (1984), *aff'd following remand*, 783 F.2d 50 (6th Cir.1986). In order to establish a *prima facie* case of retaliation, plaintiff must prove:

(1) that he engaged in an activity protected by Title VII;

(2) that he was subject to adverse employment action; and

(3) that there was a causal link between the protected activity and the adverse action of the employer.

*Cooper v. City of North Olmstead*, 795 F.2d 1265, 1271 (6th Cir.1986).

■ If retaliation for opposition to employment discrimination and participation in a proceeding under Title VII played a part in the employer's adverse job action, even if not the sole reason, the employer's action was in violation of Title VII. *Goodwin v. City of Pittsburg*, 480 F.Supp. 627 (W.D.Pa.1979), *aff'd* 624 F.2d 1090 (3d Cir. 1980).

■ In this case it is undisputed that Harris engaged in an activity protected by Title VII: He filed a charge of racial and age discrimination with the Ohio Civil Rights Commission. Further, Harris was subject to what he perceived to be adverse employment action in that he was subjected to the special evaluation procedure. Finally, Harris must show that there was a causal link between the protected activity and the adverse action of the employer. Principal O'Leary stated that he was aware that Harris had filed a civil rights complaint but that health concerns, not the charge before the Ohio Civil Rights Commission, was the basis for the special evaluation. O'Leary Depos. at 11. Harris filed a complaint with the Ohio Civil Rights Commission on September 16, 1983 and was subjected to the special evaluation process initiated in November, 1984. The fact that he received an intervening successful evaluation in June, 1984 rebuts his contention that the special evaluation was retaliatory. Accordingly, the Court holds that Plaintiff Harris has failed to establish a *prima facie* case of retaliation.

### d. Defendants' Burden of Production

■ In order to satisfy its burden of production, defendants must show that it had legitimate non-discriminatory reasons for discharging the plaintiff. *McDonnell–Douglas Corp. v. Green*, 411 U.S. at 802, 93 S.Ct. at 1824; *Texas Dept. of Community Affairs v. Burdine*, 450 U.S. at 253, 101 S.Ct. at 1093.

Defendants argue that plaintiff was not discharged but rather voluntarily resigned and that the special evaluation was initiated solely because of health concerns. In support of this position defendants rely only on the deposition statements of O'Leary and Cunningham. Conspicuously absent from the record are copies of the work records of the plaintiff. Clearly, the CBOE would maintain records containing such statistical evidence which would support their position that Harris had excessive absences. Plaintiff has admitted that he had health related problems during the time period at issue in this litigation and has denied that he slept in class.

The Title VII analysis does not end when the defendant meets its intermediate burden. The plaintiff is then provided an opportunity to demonstrate that the proffered reasons for the employment decision were pretextual. Plaintiff can establish this requirement by either showing the reasons offered are not the true reasons or are unworthy of credence. *Burdine*, at 256, 101 S.Ct. at 1095.

It must be remembered that defendants do not have to prove the absence of discrimination. *Board of Trustees v. Sweeney*, 439 U.S. 24, 25, 99 S.Ct. 295, 296, 58 L.Ed.2d 216 (1978). Here, CBOE has articulated arguably legitimate reasons for subjecting plaintiff to a special evaluation. However, their reasons are contradicted by plaintiff. Under Title VII the plaintiff is required to demonstrate that the proffered reasons were mere pretext masking discriminatory conduct. The facts and circumstances of this case indicate that plaintiff may be able to sustain that burden. Accordingly, the Court finds that a genuine issue of material facts exists regarding Harris's Title VII claim precluding summary judgment.

### E. *Age Discrimination Claim*

■■ Plaintiff Harris asserts a claim under the Age Discrimination of Employment Act (ADEA), under 29 U.S.C. § 623(a)(1). This section provides:

(a) It shall be unlawful for an employer:

(1) to fail or refuse to hire or to discharge any individual or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's age.

■■ A plaintiff who brings an action under the ADEA must prove that age was a determining factor in the employer's decision that was adverse to him. *Kraus v. Sobel Corrugated Containers, Inc.*, 915 F.2d 227, 229–30 (6th Cir.1990). Under the ADEA, the plaintiff bears the initial burden of establishing a *prima facie* case of age discrimination under the *McDonnell–Douglas v. Green* guidelines. As modified to fit age discrimination cases, the *McDonnell–Douglas* test requires that a plaintiff demonstrate that:

(1) he was a member of the protected class;

(2) he was discharged;

(3) he was qualified for the position; and

(4) he was replaced by a younger person.

*Ackerman v. Diamond Shamrock*, 670 F.2d 66, 69 (6th Cir.1982) (citing *Marshall v. Goodyear Tire and Rubber Co.*, 554 F.2d 730, 735 (5th Cir.1977)). The *McDonnell–Douglas* analysis is not to be applied in a rigid and mechanical manner, but rather, based on the facts and circumstances of the individual case. *Laugesen v. Anaconda Co.*, 510 F.2d 307 (6th Cir.1975).

Plaintiff Harris, at age sixty-nine, was clearly a member of the protected class. As noted above, Harris's resignation letter presents a colorable basis for inferring that he was constructively discharged. Plaintiff Harris's prior evaluations and defendant O'Leary's admission that Harris was a well-qualified instructor, O'Leary Depos. at 21, provides a reasonable basis to conclude that Harris was qualified for the position. The fact that excessive absenteeism due to illness may have provided a basis for the special evaluation which precipitated Plaintiff Harris's resignation is not documented in the record. Also absent from the record is any mention of who replaced Harris at South High School. No doubt, due to Harris's age (sixty-nine) and the CBOE's retirement at age seventy policy it is unlikely

that plaintiff was not replaced by a younger person.

Based on the factors set out above, the court holds that a genuine issue of material fact exists precluding summary judgment on Plaintiff Harris's ADEA claim.

### F. Pendent State Law Claims

Plaintiffs have asserted pendant state law claims alleging breach of contract, intentional infliction of emotional distress and defamation. Defendants argue that plaintiffs' state law claims must be dismissed as a matter of law.

▬▬▬ It is clear that Plaintiffs' intentional infliction of emotional distress and defamation claims are barred by O.R.C. § 2305.11. This section provides a one-year statute of limitations for intentional torts. Baldwin alleges that she was constructively discharged on April 27, 1984. She was not added as a party plaintiff until almost three years later upon the filing of the Amended Complaint on March 27, 1987. Plaintiff Harris alleges he was constructively discharged on January 31, 1985. His original Complaint was filed on July 28, 1986. Even if we assume that his claims as pled in the Amended Complaint relate back to the date the Original Complaint was filed the claims would nevertheless be time-barred. Accordingly, Plaintiffs' intentional tort claims are DISMISSED.

▬▬▬ Defendants contend that plaintiffs have failed to show that defendants breached their contracts with plaintiffs. As noted in the March 6, 1989 Opinion and Order, there are two types of teaching contracts recognized in Ohio. As defined by O.R.C. § 3319.08, a limited contract is one which for a term not to exceed five years. A continuing contract (better known as tenure) is one that remains in effect until the teacher resigns or retires, is retired by the board of education under § 3319.37, or is terminated or suspended.

▬▬▬ A teacher under a limited contract is not entitled to a due process hearing upon the non-renewal of the teaching contract. *Matheny v. Frontier*, 62 Ohio St.2d 362, 405 N.E.2d 1041 (1980). The Sixth

Circuit has held that a non-tenured teacher has no expectation of continued employment where a statutory tenure scheme exists. *Ryan v. Aurora City Bd. of Ed.*, 540 F.2d 222 (6th Cir.1976). Plaintiff Baldwin has established no evidence that she was entitled to remain employed in the Columbus City Schools. This Court has already held that "§ 401.03 provides more than is required by law." March 6, 1989 Opinion and Order at 7. Plaintiff Baldwin has failed to allege facts sufficient to allow the Court to conclude that defendants breached the collective bargaining agreement by subjecting her to a special evaluation.

▬▬▬ With respect to Plaintiff Harris, because it is unclear whether Plaintiff Harris voluntarily retired or was constructively discharged, summary judgment in favor of defendants on his breach of contract claim is inappropriate at this time. A verdict in favor of Harris on the Title VII and ADEA claims could provide an sufficient basis to enable a reasonable jury to find in his favor on the breach of contract claim.

▬▬▬ Plaintiff Baldwin's breach of implied contract also must fail. In ¶ 54 of the Amended Complaint Baldwin alleges that defendant Cunningham promised her that if she took certain courses she would be rehired. She further alleges that Cunningham's failure to rehire her after she successfully completed the academic work constitutes breach of an implied contract. Viewing the factual allegations in the light most favorable to plaintiff, as we must, it is clear that this claim must nevertheless fail. Under O.R.C. §§ 3919.07 and 3919.11 ultimate authority for hiring teachers is vested in the local board of education. *Justus v. Brown*, 42 Ohio St.2d 53, 325 N.E.2d 884 (1975). Thus, under the legislative scheme established by the General Assembly defendant Cunningham as Personnel Director simply could not make a promise, implied or otherwise, to reemploy plaintiff. The decision to hire is solely within the discretion of CBOE upon the recommendation of the superintendent. For these reasons, Plaintiff Baldwin's implied contract claim must be DISMISSED.

## V. Conclusion

Plaintiff Baldwin's claims are DISMISSED. Summary Judgment for the defendants with respect to her claims under 42 U.S.C. § 1981, 1983, 1985, and 1986 and her pendant state law claims is GRANTED.

Plaintiff Harris's Title VII, ADEA and breach of contract claims remain viable. All other claims brought by Plaintiff Harris are DISMISSED. Defendants' Motion for Summary Judgment is GRANTED in part and DENIED in part.

While the court was considering defendants' Motion for summary Judgment, plaintiff Baldwin filed a Motion for Severance under F.R.Civ.P. 42(b) to sever her case form that of Plaintiff Harris. Insofar as this Opinion and Order dismisses all of Baldwin's claims, the June 5, 1992 Motion for severance is DENIED as MOOT.

WHEREUPON upon consideration and being duly advised, the Court holds that defendants' Motion for Summary Judgment is GRANTED in part and DENIED in part.

IT IS SO ORDERED.