Deborah REED, et al., Plaintiffs,

v.

KNOX COUNTY DEPT. OF HUMAN SERVICES, et al., Defendants.

No. C2–96–288.

United States District Court, S.D. Ohio, Eastern Division.

June 23, 1997.

James H. Banks, Dublin, OH, for Plaintiffs.

Mark Landes, Isaac, Brant, Ledman & Teetor, Columbus, OH, for Defendants.

## OPINION AND ORDER

GRAHAM, District Judge.

This is an action filed by David Reed and his wife Deborah Reed, both individually and on behalf of their four minor children, Jonathan, Katie, Addie and Audra Reed. The defendants are Knox County, Ohio; the Knox County Department of Human Services ("KCDHS"); Roger Shooter, Director of KCDHS; KCDHS employees Doug McLarnan, Margaret Elliott, Kevin Kibble and Ann Oliver Miller; the Knox County Sheriff's Department; Knox County Sheriff Dave Barber; Knox County Sheriff Department employees Dennis Foster and Larry White; and Knox County Commissioners Cedric Coonfare, Allen Stockberger and Robert Durbin. The individual defendants are named in their official and individual capacities.

Plaintiff's David and Deborah Reed allege that in April of 1994, they were licensed as foster parents in Knox County. Under the foster care system, children are placed in licensed foster homes pursuant to an individual child care agreement negotiated by KCDHS and the foster parents. Plaintiffs allege that in September of 1994, they agreed to the placement of a foster child, a fourteen-year-old girl referred to as "Theresa", in their home. During her stay of seventeen days, Theresa allegedly engaged in disruptive behavior which included throwing dissected animals into the Reeds' swimming pool and tattooed satanic symbols on the leg of Katie, their oldest daughter, which had to be surgically removed. Plaintiffs allege that the KCDHS defendants failed to provide them with information on Theresa' background and criminal history prior to her placement with them.

Plaintiffs further allege that on October 5, 1994, a nine-year-old boy referred to as "Frankie" was placed in their home. Plaintiffs contend that the KCDHS defendants failed to provide them with information concerning Frankie's violent and sexual tenden-

cies. Plaintiffs allege that Frankie physically assaulted their children, threatened plaintiffs with knives, frequently used sexually explicit language, and sexually assaulted their two younger daughters. Plaintiffs allege that when they contacted the sheriff's department on October 31, 1994, no action was taken to remove Frankie from their home or to protect the plaintiffs. Frankie was removed from plaintiffs' home on November 4, 1994 and placed in Upham Hall, a psychiatric facility at the Ohio State University, for a ten-day evaluation, and was not returned to plaintiffs' home.

Plaintiffs allege that KCDHS withheld information concerning the problem foster children to avoid the payment of additional fees applicable to special needs children. Plaintiffs state that they made complaints to KCDHS and the commissioners but that no action was taken. Plaintiffs contend that defendants Knox County and the commissioner defendants promulgated and adopted an official custom or policy which promotes nondisclosure of information, negligence and fraud by the KCDHS.

Plaintiffs have asserted claims for a violation of their civil rights under 42 U.S.C. §§ 1983, 1985 and 1986. Plaintiffs allege that the Reed children suffered emotional trauma as a result of the conduct of the foster children, and that the Reeds have incurred expenses for psychiatric counselling for their children. Plaintiffs further allege that the defendants failed to pay them the appropriate per diem rate for the care of "special needs" foster children. The complaint also includes pendent state claims based on negligence, fraud, and intentional and negligent infliction of serious emotional distress.

This matter is before the court on the motion for summary judgment filed by the defendants. The procedure for granting summary judgment is found in Fed.R.Civ.P. 56(c), which provides:

> The judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.

The evidence must be viewed in the light most favorable to the nonmoving party. *Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970). Summary judgment will not lie if the dispute about a material fact is genuine, "that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). However, summary judgment is appropriate if the opposing party fails to make a showing sufficient to establish the existence of an element essential to that party's case and on which that party will bear the burden of proof at trial. *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). *See also Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).

The Sixth Circuit Court of Appeals has recognized that *Liberty Lobby, Celotex* and *Matsushita* effected "a decided change in summary judgment practice," ushering in a "new era" in summary judgments. *Street v. J.C. Bradford & Co.,* 886 F.2d 1472, 1476 (6th Cir.1989). The court in *Street* identified a number of important principles applicable in new era summary judgment practice. For example, complex cases and cases involving state of mind issues are not necessarily inappropriate for summary judgment. *Id.* at 1479. In addition, in responding to a summary judgment motion, the nonmoving party "cannot rely on the hope that the trier of fact will disbelieve the movant's denial of a disputed fact, but must 'present affirmative evidence in order to defeat a properly supported motion for summary judgment.'" *Id.* (quoting *Liberty Lobby,* 477 U.S. at 257, 106 S.Ct. at 2514). The nonmoving party must adduce more than a scintilla of evidence to overcome the summary judgment motion. *Id.* It is not sufficient for the nonmoving party to merely " 'show that there is some metaphysical doubt as to the material facts.' " *Id.* (quoting *Matsushita,* 475 U.S. at 586, 106 S.Ct. at 1355). Moreover, "[t]he trial court no longer has a duty to search the

entire record to establish that it is bereft of a genuine issue of material fact." *Id.* That is, the nonmoving party has an affirmative duty to direct the court's attention to those specific portions of the record upon which it seeks to rely to create a genuine issue of material fact.

Defendants have moved for summary judgment on plaintiffs' claims under 42 U.S.C. § 1983. Plaintiffs claim that the conduct of the foster children allegedly caused their children to sustain physical and psychological injuries. Defendants argue that this claim falls within the scope of *DeShaney v. Winnebago County Dept. of Social Services,* 489 U.S. 189, 109 S.Ct. 998, 103 L.Ed.2d 249 (1988). In *DeShaney,* the Supreme Court addressed the claims of a child who sustained injuries inflicted by his natural father after the defendant agency returned him to the father's custody. The Supreme Court held, 489 U.S. at 197, 109 S.Ct. at 1004, that a governmental entity has no obligation under the Due Process Clause of the Fourteenth Amendment to protect citizens from the violent acts of private persons such as the child's father.

The Supreme Court went on to note that a duty to protect on the part of the state may arise where a "special relationship" exists between the individual and the state, such as in the case of prison inmates and persons confined to mental institutions. *Id.* at 198–200, 109 S.Ct. at 1004–1006. However, such a relationship arises only where "the State by the affirmative exercise of its power so restrains an individual's liberty that it renders him unable to care for himself, and at the same time fails to provide for his basic human needs[.]" *Id.* at 200, 109 S.Ct. at 1005. "The affirmative duty to protect arises not from the State's knowledge of the individual's predicament or from its expressions of intent to help him, but from the limitation which it has imposed on his freedom to act on his own behalf." *Id. See also Foy v. City of Berea,* 58 F.3d 227, 230 (6th Cir.1995) (mere knowledge of danger to plaintiff does not create affirmative duty to protect). The Supreme Court concluded that the harm suffered by the child occurred while he was in the custody of his father, not in the custody

of the state, and that the agency had no constitutional duty to protect the child even though it may have been aware of the dangers he faced. *DeShaney,* 489 U.S. at 201, 109 S.Ct. at 1006.

The Supreme Court in *DeShaney* further observed that the conduct of the agency may have lead to the creation of a duty on its part to protect the child under state tort law. *DeShaney,* 489 U.S. at 202, 109 S.Ct. at 1006. However, the Court went on to note that the Due Process Clause of the Fourteenth Amendment "does not transform every tort committed by a state actor into a constitutional violation." *Id.* The Court found that because the agency had no constitutional duty to protect the child against his father's violence, the agency's failure to do so did not constitute a violation of the Due Process Clause. *Id.*

Plaintiffs respond by stating that they are not asserting a § 1983 claim based on a "failure to protect" theory which would be barred by *DeShaney.* The theories of liability argued by plaintiffs in their memorandum contra defendants' motion for summary judgment include: 1) alleged violations of the Equal Protection Clause of the Fourteenth Amendment; 2) liability on the part of Knox County and KCDHS based on their *in loco parentis* status in relation to the foster children; 3) liability based on failure to warn or creation of danger; 4) the alleged deprivation of Mr. and Mrs. Reed's interest in the companionship of their children, and 5) the failure of defendants to pay them the appropriate per diem rate for the foster children. The court will address each of these claims in turn.

■ Plaintiffs assert an equal protection claim on behalf of the Reed children. Plaintiffs cite *Meador v. Cabinet for Human Resources,* 902 F.2d 474 (6th Cir.1990), in which the court held that a state statute created due process rights on the part of foster children to be free from the infliction of unnecessary harm in state-regulated foster homes. Some courts have taken the position that state agents may be liable to a child in state custody who sustains injuries in a foster home where the state agents knew or had reason to know that the child was likely to

suffer harm in the foster home. *See, e.g., Norfleet By & Through Norfleet v. Arkansas Dept. of Human Servs.*, 989 F.2d 289 (8th Cir.1993); *Yvonne L., By & Through Lewis v. New Mexico Dept. of Human Servs.*, 959 F.2d 883 (10th Cir.1992); *K.H. Through Murphy v. Morgan*, 914 F.2d 846 (7th Cir. 1990). Plaintiffs argue that the duty of a government agency to protect foster children from harm should apply equally to the Reed children.

This argument ignores the fact that the circumstances of a foster child who is in the custody of the state differ from those of a child who is in the custody of its natural parents. In *McComb v. Wambaugh*, 934 F.2d 474, 483 (3d Cir.1991), the court found that the state's exercise of a higher degree of care toward children in foster care versus children in the custody of their natural parents did not violate the equal protection rights of a child who was injured by his natural mother. The court noted that a state may not interfere with the parent-child relationship absent compelling circumstances, whereas the foster parent-child relationship is a creature of state law and therefore subject to regulation. *Id.* The court concluded that the state's differing responsibilities toward both classes of children justifies the variance in treatment. *Id. See also Griffith v. Johnston*, 899 F.2d 1427, 1441 (5th Cir. 1990) (rejecting argument that adopted children and children in state custody are similarly situated for equal protection purposes).

While plaintiffs contend that the KCDHS should bear the same responsibilities toward the Reed children that it carries in its supervision of foster children, they do not indicate a willingness to abdicate their parental responsibilities and take directions from KCDHS on the care and discipline of the Reed children. Plaintiff's position would unfairly result in the imposition of an ill-defined duty of care on § 1983 defendants such as KCDHS without granting these agencies the necessary authority to fulfill that duty.

Plaintiffs' equal protection theory was also implicitly rejected in *DeShaney.* The Court noted, 489 U.S. at 201 n. 9, 109 S.Ct. at 1006 n. 9, that the state's placement of a child in a foster home operated by its agents might present "a situation sufficiently analogous to incarceration or institutionalization to give rise to an affirmative duty to protect." However, the Court rejected the invitation to impose a constitutional duty on the state to protect children from the acts of their natural parents. Plaintiffs' equal protection claim against the KCDHS defendants is not well founded.

■ Plaintiffs also allege that the Knox County Sheriff Department defendants violated their equal protection rights by favoring the foster children over the Reed children. This allegation, while unclear, apparently relates to the manner in which the sheriff's department personnel handled their complaints about Frankie's conduct.

■ While the state's failure to protect an individual against private violence does not constitute a violation of the Due Process Clause, the state "may not, of course, selectively deny its protective services to certain disfavored minorities without violating the Equal Protection Clause." *DeShaney*, 489 U.S. at 197 n. 3, 109 S.Ct. at 1004 n. 3. However, plaintiffs must prove that the defendants acted with the intent to discriminate based upon an impermissible classification such as race or gender. *See, e.g., Ricketts v. City of Columbia, Mo.*, 36 F.3d 775, 781 (8th Cir.1994) (proof of gender discrimination required for claim of unequal treatment in police investigation of domestic violence complaints).

Even if it is assumed that children in the custody of their parents can be regarded as a class for equal protection purposes, plaintiffs have introduced no evidence that the sheriff's department inadequately responded to their complaint concerning Frankie's conduct based upon the status of the Reed children. The evidence relating to the involvement of the sheriff's department in this case is scant. Mrs. Reed testified in her deposition that when she learned of Frankie's sexual overtures to her daughter, Sue Carpenter, apparently a friend of Mrs. Reed's, called the sheriff. Defendant White came to the house and questioned Frankie. Deputy White talked to Mrs. Reed about whether Frankie would be safe to leave in the house, but Mrs.

Reed did not request him to remove Frankie from the house. Deborah Reed Dep., pp. 93–94.

Mrs. Reed also testified that she had no contact with defendant Barber either before or after Frankie's placement with them. Deborah Reed Dep., pp. 123–124. Defendant Foster came to investigate her complaint and that he was "very sympathetic." Deborah Reed Dep., pp. 124–126. Plaintiffs were dissatisfied with the result of Foster's investigation because he "implied that the problem was our ability as foster parents, not the actions of the child[.]" Deborah Reed Affid., Para. 16. The Foster investigation occurred after Frankie was removed from plaintiffs' home; thus, the investigation had no causal connection with the conduct of Frankie which allegedly injured the plaintiffs. Plaintiffs accuse the sheriff's department defendants of failing to act to remove Frankie from their home. However, plaintiffs have pointed to no evidence that they requested the sheriff's department defendants to do so, or that Frankie engaged in harmful conduct after such a request for removal was refused. In any event, absent evidence of an unlawful discriminatory motive, the failure of the sheriff's department defendants to remove Frankie from their home would constitute a "failure to protect" claim barred by DeShaney. Plaintiffs have failed to demonstrate the existence of sufficient evidence to present their equal protection claim against the sheriff department defendants to a jury.

■ Plaintiffs argue that the KCDHS defendants should be held accountable for the actions of the foster children under the theory that KCDHS occupied the position of in loco parentis in relation to the foster children. The court in Dorothy J. v. Little Rock School Dist., 794 F.Supp. 1405 (E.D.Ark. 1992), aff'd, 7 F.3d 729 (8th Cir.1993) rejected a similar argument. The court found that even though a mentally retarded child who caused the injury to plaintiff's son was a ward of the state, so that the state stood in loco parentis to this child, this did not transform the child into a state actor. Id. at 1410. The court concluded that since the foster child was a private actor, plaintiff's claim that the defendants failed to protect her son from

harm caused by the foster child was precluded by DeShaney.

This court agrees with the above reasoning. "A contrary conclusion would expand the reach of federal civil rights law by bringing within the law's scope a myriad of private individuals with whose care the state has been entrusted." Dorothy J., 794 F.Supp. at 1410. This result is also consistent with the rejection of the theory of holding state actors vicariously liable under § 1983 for the acts of their agents or employees. See Taylor v. Michigan Dept. of Corrections, 69 F.3d 76 (6th Cir.1995) (no respondeat superior liability in § 1983 actions). It also avoids the thorny question of whether Mr. and Mrs. Reed, as licensed foster parents, were also state agents responsible for the conduct of the foster children and therefore liable to their own children for injuries caused by the foster children. While defendants may be liable for the conduct of the foster children under an in loco parentis theory under Ohio law, this claim is not cognizable under § 1983.

■ Plaintiffs also contend that the failure of the KCDHS defendants to provide them with information concerning the foster children constituted a violation of their due process rights. Plaintiffs have submitted documents obtained from KCDHS in discovery which include records reflecting Theresa's juvenile delinquency record of vandalism, marijuana and alcohol abuse, and truancy. The records also contain reports of Frankie hitting and kicking other children, lying, stealing, setting fires, and using sexually explicit language, such as asking classmates, "Do you want to fuck?" Plaintiffs contend that this information was not revealed to them. Plaintiffs contend that they would not have accepted these foster children into their homes if they had been aware of this information.

Defendants have submitted the affidavit of Ann Miller, who states that Mrs. Reed was given a document which included the information that Frankie had problems with stealing and fire-setting and that he was sexually suggestive. The affidavit of Kevin Kibble states that Mrs. Reed was given documents indicating that Theresa was raised in a fami-

ly with significant mental health problems, that she displayed poor coping skills, that she had labile emotions and behavioral problems, that she had attempted suicide twice, and that she needed structure, consistency and close supervision. Defendants have offered no evidence that the Reeds were provided with the other information reflected in the records submitted by plaintiffs.

Mrs. Reed testified in her deposition that she was told that Theresa had been raised in a family with mental health and behavioral problems, that she had attempted suicide on two occasions, and that structure and consistency were needed. Deborah Reed Dep. p. 41, 66. She also stated that the records she saw indicated that treatment foster care [1] of one to three months was recommended, and she was aware that she was not qualified to provide this type of service. *Id.* She was told to keep Theresa's medication out of reach and hidden. *Id.* at 44. Her testimony indicates that she was aware that Theresa was on probation, but was not told the nature of her juvenile record. *Id.* at 67. She further stated that "[a]s soon as [Theresa's] placement became more than the three days [initially scheduled] they told me stories of her young childhood."

Mrs. Reed was told that Frankie needed counselling. *Id.* at 73. She did not recall at her deposition whether she was told that Frankie had been disciplined for stealing or attempting to set fires at school. *Id.* at 74. She denied being told that he used sexually explicit language, but she acknowledged that prior to October 31, 1994, she observed this behavior in Frankie. *Id.* at 74, 101.

Plaintiffs have submitted the affidavit of Mrs. Reed, in which she states that she was only informed of Theresa's suicide attempts. However, she acknowledges receiving other information in her deposition. Mrs. Reed also states that she was told that there was nothing wrong with Frankie, but she stated in her deposition that she was informed that he needed counselling. The above statements in her affidavit conflict with her previ-

ous deposition testimony, and they are insufficient to create a genuine issue of fact. *Gagne v. Northwestern Natl. Ins. Co.,* 881 F.2d 309, 315 (6th Cir.1989). However, as indicated previously, there is no evidence that plaintiffs were provided with all the information in the records which they have tendered, and the record does reflect a factual dispute as to exactly what information concerning Frankie was provided to the plaintiffs.

Assuming for purposes of the summary judgment motion that the KCDHS defendants knowingly possessed information concerning Theresa and Frankie which was not provided to the plaintiffs, the court is unaware of any authority recognizing a constitutional duty to disclose such information. Plaintiffs have cited no cases standing for the proposition that the Due Process Clause places a particularized duty on the state to provide foster parents with information concerning foster children placed in their custody. On the other hand, defendants have cited authority which suggests that no such duty exists.

In the analogous case of *Griffith v. Johnston,* 899 F.2d 1427, 1438 (5th Cir.1990), the court rejected the argument that parents had a "fundamental right" to be provided information by the state concerning children they were considering for adoption, noting that acceptance of plaintiffs' position would result in converting the state agency into the insurer of the children's health.

Defendants also cite *Collins v. City of Harker Heights, Tex.,* 503 U.S. 115, 112 S.Ct. 1061, 117 L.Ed.2d 261 (1992). In *Collins,* the Supreme court held that a municipality's failure to warn its employees regarding workplace hazards of which it is aware does not violate the Due Process Clause or give rise to a § 1983 claim. *Id.,* 503 U.S. at 128, 112 S.Ct. at 1070. The Court concluded that the claim amounted to one in state tort for a breach of the duty of care to provide a safe work environment, and that the Due Process

---

**1.** Under O.R.C. § 2151.011(49), a "treatment foster home" means "a family foster home that incorporates special psychological or medical treatment designed to care for the specific needs of the children received in the family foster home

and that receives and cares for children who are emotionally or behaviorally disturbed, medically fragile and require special medical treatment due to physical ailment or condition, or mentally retarded or developmentally disabled."

Clause does not guarantee a workplace free of unreasonable risks of harm. *Id.,* 503 U.S. at 128–129, 112 S.Ct. at 1070–1071.

In *Hiser v. City of Bowling Green,* 42 F.3d 382 (6th Cir.1994), the plaintiff's decedent was murdered by a police informant who had a violent criminal history. The police knew about the informant's violent tendencies, yet permitted the informant to reside with the victim to monitor drug dealing activity without warning her of the informant's record. The Sixth Circuit found that even if the police knew of the informant's violent tendencies, plaintiff's claim was barred by *DeShaney* because the police placed no affirmative restrictions on the victims's ability to protect herself. *Id.* at 384.

In this case, even assuming that the defendants knew about the information in the records submitted by plaintiffs but failed to provide this information to plaintiffs when they permitted the foster children to be placed in plaintiffs' home, the failure to provide information, in itself, does not provide plaintiffs with a basis for a § 1983 claim. *Hiser* indicates that *DeShaney* would bar plaintiff's claim for the failure to provide information where the plaintiffs seek compensation for damages resulting from injuries caused by the foster children, who are private actors, and where no evidence has been offered that the defendants' conduct went beyond mere omissions and affirmatively limited plaintiffs' ability to protect themselves.

■ Plaintiffs also rely on the "state-created danger" theory. Plaintiffs did not specifically articulate this theory in their complaint, but they argue in their memorandum contra the motion for summary judgment that by failing to inform them about the histories of the foster children and failing to promptly remove Frankie from their home, the defendants acted to increase the vulnerability of plaintiffs to violence beyond the level it would have been absent state action.

Some courts have recognized the liability of state actors under § 1983 for failure to protect where the state creates the danger. *See, e.g., Cornelius v. Town of Highland Lake,* 880 F.2d 348 (11th Cir.1989); *Wood v. Ostrander,* 879 F.2d 583 (9th Cir.1989).

There is some question as to whether that theory survived *DeShaney. See, e.g., Foy v. City of Berea,* 58 F.3d 227 (6th Cir.1995); *Leffall v. Dallas Independent School Dist.,* 28 F.3d 521, 530 (5th Cir.1994).

■ Courts have pointed to language in *DeShaney,* 489 U.S. at 197, 109 S.Ct. at 1004 (noting that the state played no part in the creation of the dangers facing the plaintiff, "nor did it do anything to render him any more vulnerable to them"), as providing support for this theory. However, this comment should not be read as an approval of § 1983 liability whenever a state actor has increased the risk of harm from private sources. *Dorothy J. v. Little Rock School Dist.,* 7 F.3d 729, 734 (8th Cir.1993). "Such a ruling would make § 1983 virtually coterminous with traditional tort law, the very expansion of constitutional tort liability that the Supreme Court has rejected[.]" *Id.*

"*DeShaney* does not specify what actions of a state would render a person more vulnerable to danger, nor how much more vulnerable to danger a state must make a person before the person's due process rights are violated." *Gazette v. City of Pontiac,* 41 F.3d 1061, 1065 (6th Cir.1994). However, the requirements of such a claim have been the topic of numerous decisions. In *Johnson v. Dallas Independent School Dist.,* 38 F.3d 198, 201 (5th Cir.1994), the court set forth the elements of a state-created danger claim as follows: "[T]he environment created by the state actors must be dangerous; they must know it is dangerous; and, to be liable, they must have used their authority to create an opportunity that would not otherwise have existed for the third party's crime to occur."

■ "Liability under the state-created danger theory" requires some direct action on the part of government officials which creates or enhances the danger. *See Scrgi v. Kent City Bd. of Educ.,* 70 F.3d 907, 913 (6th Cir.1995) (liability under the state-created danger theory must be predicated on the state's affirmative acts which work to plaintiff's detriment in terms of exposure to danger which plaintiff was not already exposed to); *McComb,* 934 F.2d at 483 (where son injured by mother upon state's returning him

to her custody, claim based on errors of omission or inaction committed by state officials fell within scope of *DeShaney* even though inaction allowed dangerous situation to ripen).

The court in *Pinder v. Johnson,* 54 F.3d 1169, 1176 n. *, 1177 (4th Cir.1995) noted that some conduct by an officer which directly caused harm to the plaintiff is required, and further commented:

All [cases recognizing liability outside the custodial context] involved some circumstance wherein the state took a much larger and more direct role in "creating" the danger itself. . . . When the state itself creates the dangerous situation that resulted in a victim's injury, the absence of a custodial relationship may not be dispositive. In such instances, the state is not merely accused of a failure to act; it becomes much more akin to an actor itself directly causing harm to the injured party.

"In most every circuit court decision imposing § 1983 liability because the State affirmatively created or enhanced a danger, 'the immediate threat of harm has a limited range and duration[.]' " *Dorothy J.,* 7 F.3d at 733 n. 4 (quoting *Reed v. Gardner,* 986 F.2d 1122, 1127 (7th Cir.1993)). Where the plaintiff's injury is "too remote a consequence" of the action or inaction of state officials, no liability exists under § 1983. *Martinez v. California,* 444 U.S. 277, 285, 100 S.Ct. 553, 559, 62 L.Ed.2d 481 (1980); *Dorothy J.,* 7 F.3d at 733.

In *Gazette,* the plaintiff sued police officers for misrepresenting to the family of a kidnapping and murder victim that her status as a missing person was being investigated, when in fact no investigation was made. The court concluded, *Id.* at 1065–1066, that there was no direct causal link between the misrepresentations of the police officers and the death of the victim sufficient to sustain a claim for deprivation of due process rights, noting that "[t]here cannot be Section 1983 liability where the actions of one private individual leading to the injury or death of another individual are too remote from the allegedly wrongful state action."

In *Foy,* the Sixth Circuit addressed a situation where plaintiff's decedent and a friend were ordered by police officers to get in their car and leave a college campus because they were intoxicated and causing a disturbance. The two men left in the car and were involved in a car accident, in which plaintiff's decedent was killed. The court found that the police officers took no action which deprived the decedent of his ability to care for himself, and that plaintiff's claim was precluded by *DeShaney.* The court distinguished its previous decision in *Nishiyama v. Dickson County, Tenn.,* 814 F.2d 277 (6th Cir.1987), in which the court held that a due process claim was stated against police officers who permitted an inmate to use a marked police car, despite reports that the inmate was using the car to flag down motorists, where the inmate pulled over plaintiffs' decedent and murdered her. The court noted that the substantive due process violation in *Nishiyama* was based on the egregious conduct of the defendants, and that to the extent that the decision relied on the existence of a special relationship between the victim and the sheriff's office, it was no longer valid in light of *DeShaney. Foy,* 58 F.3d at 230.

In *D.R. by L.R. v. Middle Bucks Area Vocational Tech. School,* 972 F.2d 1364 (3d Cir.1992), two female students sexually assaulted by male students sued school officials who allegedly increased their risk of harm by failing to report the abuse of plaintiffs to their parents or other authorities, by placing the class under the authority of an inadequately trained student teacher, and by failing to investigate and put a stop to the sexual misconduct reported by plaintiffs. The court concluded that these acts, particularly those of nonfeasance, on the part of school officials did not rise to the level of a constitutional violation. *Id.* at 1376.

In the instant case, the only affirmative act of commission, as opposed to omission, on the part of KCDHS was to arrange for the placement of the foster children in plaintiffs' home. This was not a one-sided undertaking forced upon the plaintiffs by KCDHS, since the placement also required the agreement of the plaintiffs. Under this agreement, Mr. and Mrs. Reed assumed some degree of re-

sponsibility for the supervision of the foster children.

The evidence fails to establish that the alleged failure to inform plaintiffs about the background of the foster children rendered them more vulnerable to injury than they would have been if they had that information. Mrs. Reed admitted during her deposition that she received some information about Theresa. This information would have alerted her to the fact that Theresa required enhanced supervision. Mrs. Reed's deposition testimony documents her observations of the behavioral problems of these foster children. The evidence suggests that the Reeds were alerted to the disruptive conduct of these children prior to the acts which caused the alleged injuries to plaintiffs. For example, Mrs. Reed testified in her deposition about Theresa bringing books from the library on satanism and satanic tattoos. Deborah Reed Dep. pp. 51, 54. She also indicated that prior to the alleged sexual molestations of her daughters by Frankie, she observed him hit her children, try to kiss Addie, and use sex-oriented language. *Id.* at 79–80, 82, 101.

These circumstances were sufficient to place plaintiffs on notice that these foster children had behavioral problems and required close supervision. The evidence fails to support a finding of a direct causal connection between the alleged failure of the KCDHS defendants to provide information and the injuries inflicted by the foster children. Any connection between the conduct of the state actors and the alleged injuries in this case is even weaker than that in *Foy,* where the officers affirmatively ordered the decedent and his intoxicated friend, the driver of the car, to leave the campus.

Theresa stayed with plaintiffs for seventeen days, and Frankie was with plaintiffs for approximately one month. This case does not involve the immediate threat of harm of limited duration found in other state-created danger cases. This case differs, for example, from the acts of the officers in *Wood* who abandoned the female friend of an arrested driver in a high crime area, where she was raped by a stranger who offered to give her a ride.

It is not clear whether plaintiffs also intended to assert claims against the sheriff's department defendants under a creation of danger theory due to their failure to remove Frankie from the home. However, there is no evidence to support such liability. The evidence reveals only one instance in which the sheriff's department was summoned to plaintiffs' residence, that being to report the alleged incidents of sexual misconduct by Frankie on October 31, 1994. According to Deborah Reed's deposition testimony, Deputy White discussed with her whether it would be safe for Frankie to remain at her house, and she did not ask Deputy White to remove him. There is no evidence that any later requests for removal were made to the sheriff's department, or that Frankie inflicted any injury after such a request. There is no evidence that any of the sheriff's department defendants created a danger to plaintiffs which did not otherwise exist.

There is evidence that between October 31 and November 4, 1994, plaintiffs made requests to defendant McLarnan for Frankie's removal. Exhibit FFF to plaintiffs' memorandum contra indicates that on November 1, 1994, a decision was made by KCDHS to secure Frankie's placement at Upham Hall as soon as possible, and Frankie was placed at Upham Hall on November 4, 1994. Thus, the defendants were aware of plaintiffs' concerns and promptly took steps to remedy the problem. There is no evidence that Frankie engaged in any disruptive behavior between October 31 and November 4 which caused additional injury to plaintiffs.

■ Another component of the state-created danger theory is the degree of culpability of the state actors. Gross negligence on the part of the defendants is not sufficient to impose liability under this theory. *Gazette,* 41 F.3d at 1067. Rather, to establish a violation of substantive due process rights, plaintiffs must demonstrate at least deliberate indifference to the state-created danger on the part of the defendants. *Foy,* 58 F.3d at 232; *Johnson,* 38 F.3d at 201; *Leffall,* 28 F.3d at 530.

Deliberate indifference is more than negligence or carelessness, and is the equivalent

of recklessly disregarding a known risk of harm. *Farmer v. Brennan,* 511 U.S. 825, 837, 114 S.Ct. 1970, 1979, 128 L.Ed.2d 811 (1994); *Howard v. Grinage,* 82 F.3d 1343, 1352 (6th Cir.1996); *Johnson,* 38 F.3d at 201 ("Actual knowledge of a serious risk of physical danger to the plaintiff has been a common feature of the state-created danger cases.").

The deliberate indifference standard was applied in *Doe v. Claiborne County, Tenn. By & Through Claiborne Cty. Bd. of Educ.,* 103 F.3d 495 (6th Cir.1996). In *Doe,* the plaintiff was a high school student who asserted § 1983 claims against school officials after she was harassed and sexually molested by a teacher. Evidence in that case showed that the defendants were aware of allegations and rumors of other instances of sexual misconduct on the part of this teacher prior to the incidents involving the plaintiff. The court stated that a simple assertion that the defendants were deliberately indifferent to plaintiff's constitutional rights did not state a claim under § 1983. *Id.* at 512. "A plaintiff must show that, in light of the information the defendants possessed, the teacher who engaged in sexual abuse 'showed a strong likelihood that he would attempt to' sexually abuse other students, such that the 'failure to take adequate precautions amounted to deliberate indifference' to the constitutional rights of students." *Id.* at 513 (quoting *Barber v. City of Salem,* 953 F.2d 232, 240 (6th Cir. 1992)).

The evidence in the instant case is insufficient to demonstrate a genuine issue of material fact on the issue of whether defendants acted with deliberate indifference to a known risk of harm. The information which defendants allegedly failed to disclose would not have reasonably alerted defendants to any substantial risk that Theresa would dissect small animals or place a satanic tattoo on Katie, or that Frankie, a nine-year-old boy, would make physical sexual assaults on Addie and Audra.

The court concludes that defendants are entitled to summary judgment on plaintiffs' state-created danger claims.

 Mr. and Mrs. Reed also assert a due process claim for interference with their liberty interest in the companionship of their children, which they allege was disrupted by their children's psychological problems. Some courts have permitted the parents of a child who has been injured by the conduct of a state actor in violation of § 1983 to pursue a claim for interference with the parents' liberty interest in the companionship of the child on their own behalf. *See e.g., Ward v. City of San Jose,* 967 F.2d 280 (9th Cir.1991); *Kelson v. City of Springfield,* 767 F.2d 651 (9th Cir.1985); *Bell v. Milwaukee,* 746 F.2d 1205 (7th Cir.1984). The Sixth Circuit has not yet recognized such a claim, and expressed reluctance to do so in *Purnell v. City of Akron,* 925 F.2d 941, 948 n. 6 (6th Cir. 1991) in light of its holding in *Jaco v. Bloechle,* 739 F.2d 239 (6th Cir.1984) that § 1983 provides a cause of action which is personal to the injured party.

In *Pittsley v. Warish,* 927 F.2d 3, 8 (1st Cir.1991), the court noted that most courts which recognize a protected right to familial association "have done so only where the plaintiffs have alleged a permanent, physical loss of association of an immediate family member as a result of unlawful state action." The court also held, *Id.,* that "to establish a violation of a right to familial associational privacy, the state action must be directly aimed at the parent-child relationship." *See also, Trujillo v. Board of Cty. Com'rs of Santa Fe Cty.,* 768 F.2d 1186, 1189–1190 (10th Cir.1985) (parent must plead intent to interfere with relationship; intent to deprive child of rights not transferrable to establish intent to deprive parent of right of companionship). State action which affects the parent-child relationship only incidentally does not suffice. *Pittsley,* 927 F.2d at 9.

The holdings in *Pittsley* were followed by the court in *Divergilio v. Skiba,* 919 F.Supp. 265 (E.D.Mich.1996). That case involved a situation analogous to that present in the instant case. The parents of students who were sexually abused at school by a teacher brought a claim under § 1983 for deprivation of their constitutional interest in maintenance of the parent-child relationship, including their liberty interests to preserve the safety of their children and to associate freely without the constraints of emotional distress resulting from the alleged constitutional viola-

tions. The court noted that the parents failed to allege that the defendant intentionally acted to deprive them of or to diminish their familial relationship with their children, that no permanent, physical loss of association was involved, and that any injury to the parents was merely incidental to the alleged violation of the children's constitutional rights. *Id.* at 269. The court concluded that plaintiffs failed to state a constitutional claim for interference with the parent-child relationship.

Plaintiffs here did not plead the theory of interference with the parent-child relationship in their complaint, and have not alleged an intent on the part of the defendants to interfere with this relationship. Rather, they have argued this theory for the first time in their response to defendants' motion for summary judgment. Plaintiffs have also failed to present any evidence from which an intent to interfere with the parent-child relationship could reasonably be inferred. This court agrees with the reasoning in *Pittsley* and *Divergilio,* and concludes that Mr. and Mrs. Reed have failed to state a claim under § 1983 for invasion of their familial relationship with their children.

■ In regard to plaintiffs' claim that they were not paid the correct per diem rate for the care of the foster children in accordance with their agreement with KCDHS, the court concludes that this is not a claim of constitutional dimension under § 1983. Rather, it is a claim for breach of contract under state law, and the matters involved therein are included in plaintiffs' state law claims.

■ Defendant Knox County also moves for summary judgment on the grounds that plaintiffs have failed to establish governmental liability through proof of an established practice or custom. A political subdivision is liable under § 1983 only if the political subdivision itself caused the constitutional deprivation. *Monell v. Department of Social Servs.,* 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978). A governmental body is not liable under § 1983 for an injury inflicted solely by its employee, and the doctrine of respondeat superior is inapplicable in § 1983 actions. *Id.* at 691–695, 98 S.Ct. at 2036–2038. A political subdivision is liable only where the violation of constitutional rights stems from a governmental policy or custom. *City of Canton, Ohio v. Harris,* 489 U.S. 378, 109 S.Ct. 1197, 103 L.Ed.2d 412 (1989). The local government's policy or custom "must be the moving force of the constitutional violation' in order to establish the liability of a government body under § 1983." *Polk County v. Dodson,* 454 U.S. 312, 102 S.Ct. 445, 70 L.Ed.2d 509 (1981) (quoting *Monell,* 436 U.S. at 694, 98 S.Ct. at 2037).

In order to satisfy the *Monell* requirement, plaintiffs must identify the policy at issue, connect the policy to the governmental body, and show that their injuries were incurred because of the execution of that policy. *Garner v. Memphis Police Dep't,* 8 F.3d 358 (6th Cir.1993).

Plaintiffs allege generally that Knox County, acting through the county commissioners, was responsible for county policy, and that the defendants have promulgated customs or policies "whereby cover-up, negligence and fraud by members of the KCCS and Sheriff Department, under color of law, have become the norm, the same being condoned, uncontrolled and unpunished." Complaint, Paras. 29–30. However, plaintiffs have failed to introduce any evidence which would establish the existence of any policy implemented by the county commissioners condoning negligence or fraud on the part of KCDHS or the sheriff's department. Plaintiffs point exclusively to hearsay evidence of a statement allegedly made by defendants Coonfare and Stockberger after the incidents in this case to the effect that plaintiffs were "paid to take the risk," and argue that a custom of negligence or cover-up should be "presumed" from this statement. This evidence is clearly not sufficient to show the existence of a custom or policy.

The evidence fails to show what control, if any, the commissioners have over the daily operations of KCDHS, or that the commissioners took any action to adopt an official policy or custom in regard to those operations. There is no evidence concerning whether anyone at KCDHS qualifies as a policy maker for the county.

The record is also insufficient to support custom or policy liability based on the commissioners' failure to act. Aside from inadmissible hearsay evidence that KCDHS had a custom of nondisclosure of information, there is no indication that KCDHS had a policy of nondisclosure, or that the commissioners had notice of this policy or tacitly approved it "such that their deliberate indifference in their failure to act can be said to amount to an official policy of inaction[.]" *Doe,* 103 F.3d at 508. Likewise, there is no evidence that any policy of the county was the moving force or direct causal link in the constitutional deprivation. *Id.* Plaintiffs have not demonstrated that the Knox County commissioners, either individually or in concert, were responsible for the implementation of a policy or custom which caused plaintiffs' injuries or otherwise had any involvement in the matters alleged herein, and Knox County is entitled to summary judgment.

The individual defendants have moved for summary judgment on the grounds of qualified immunity. Under the qualified immunity doctrine outlined in *Harlow v. Fitzgerald,* 457 U.S. 800, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982), government officials are immune from liability for civil rights damages insofar as their conduct did not violate clearly established statutory or constitutional rights of which a reasonable person would have known. The focus is on the objective reasonableness of the official's conduct as measured by reference to clearly established law and the information which the official possessed. *Id.* at 818, 102 S.Ct. at 2738; *Anderson v. Creighton,* 483 U.S. 635, 641, 107 S.Ct. 3034, 3039, 97 L.Ed.2d 523 (1987).

█ For a constitutional right to be clearly established, the law must be clear in regard to the official's particular actions in the particular situation. *Walton v. City of Southfield,* 995 F.2d 1331, 1335 (6th Cir. 1993). As the Supreme Court stated in *Anderson,* 483 U.S. at 640, 107 S.Ct. at 3039,

> The contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right. This is not to say that an official action is protected by qualified immunity unless the very action in ques-

tion has previously been held unlawful; but it is to say that in light of pre-existing law the unlawfulness must be apparent. The conduct of the official must fall clearly within the area protected by the constitutional right, such that a reasonable official would have known that his conduct violated the constitutional right. *Long v. Norris,* 929 F.2d 1111, 1115 (6th Cir.1991). The official is entitled to immunity where he reasonably could have thought that his actions were consistent with the rights allegedly violated. *Garvie v. Jackson,* 845 F.2d 647, 649 (6th Cir.1988).

█ In regard to the defendant commissioners, there is no evidence indicating that they were involved in any way in the alleged conduct of the KCDHS defendants, nor is there any evidence that the commissioners were responsible for implementing any custom or policy which had a direct causal link to the injuries sustained by plaintiffs. The sole basis for the claims against them appears to be plaintiffs' opinion that the commissioners did not pursue adequate measures after the alleged injuries were sustained to secure them sufficient compensation from KCDHS or to discipline the KCDHS defendants in some way. The plaintiffs have failed to produce any evidence that the commissioners were responsible for any injury of constitutional magnitude, and defendants Coonfare, Stockberger and Durbin are entitled to qualified immunity.

The evidence also fails to show that the sheriff's department defendants participated in any violation of plaintiffs' constitutional rights. There is no evidence that Sheriff Barber had any contact with the plaintiffs or any knowledge of or involvement in the alleged injuries. The sole basis for the claim against defendant Foster appears to be the report he did concerning his investigation of plaintiffs' complaint of sexual misconduct against Frankie, which occurred after Frankie was removed from plaintiffs' home and after the injuries to plaintiffs allegedly occurred. Plaintiffs disagreed with the report, which allegedly implied that the problem was with Mr. and Mrs. Reed's ability as foster parents. There is likewise no evidence that defendant White participated in or contribut-

ed to any injuries sustained by the plaintiffs. He responded to plaintiffs' residence and took their report, and although he questioned them whether it was safe to leave Frankie in the house, there is no evidence that he was asked to remove Frankie. There is no evidence that any of the sheriff's department defendants participated in any conduct which they reasonably should have known would constitute a violation of plaintiffs' constitutional rights, and they are entitled to qualified immunity.

Plaintiffs claims against the KCDHS defendants are based on their alleged failure to disclose information and to promptly remove Frankie from their home. There is no competent evidence of any involvement on the part of defendant Shooter in the alleged events. There is no respondeat superior liability under § 1983 and as director of KCDHS, he cannot be held liable for the acts of his subordinates absent proof that he encouraged the specific incident of misconduct or in some other way directly participated in it. *Taylor,* 69 F.3d at 80–81.

There is evidence from which a jury might infer that defendants McLarnan, Miller, Elliott and Kibble had some prior knowledge of the behavioral problems of Theresa and Frankie. However, as noted previously, plaintiffs have pointed to no authority which would impose a constitutional duty of disclosure of this information on the defendants. Among the state-created danger cases reviewed by this court, the court found no cases which based liability under that theory on a failure to disclose information. Based on the evidence before the court, the KCDHS defendants would not have been aware, based on the legal precedent at the time, that their conduct would constitute a violation of plaintiffs' constitutional rights, and they are entitled to qualified immunity.

No genuine issue of material fact has been demonstrated in regard to plaintiffs' claims under § 1983, and defendants are entitled to summary judgment on those claims.

█ Plaintiffs have also advanced claims under 42 U.S.C. §§ 1985 and 1986 in their complaint. However, the allegations of conspiracy in the complaint are vague and conclusory, and plaintiffs have failed to offer any evidence to support their conspiracy theory. In addition, a conspiracy claim under § 1985(3) and § 1986 must be based on a racial or other class-based, invidiously discriminatory animus. *United Bhd. of Carpenters & Joiners, Local 610 v. Scott,* 463 U.S. 825, 829, 103 S.Ct. 3352, 3356, 77 L.Ed.2d 1049 (1983); *Brock v. McWherter,* 94 F.3d 242, 247 n. 4 (6th Cir.1996). No such animus has been pleaded in the complaint or established by the evidence. The viability of the 42 U.S.C. § 1986 claim is dependent on plaintiffs' § 1985 claim. *Shimman v. Intl. Union of Operating Engineers, Local 18,* 744 F.2d 1226, 1237 n. 15 (6th Cir.1984); *Harris v. Board of Education,* 798 F.Supp. 1331, 1346 (S.D.Ohio 1992) (§ 1986 contains no substantive provisions and was enacted only to enforce § 1985). The defendants are entitled to summary judgment on plaintiffs' § 1985 and § 1986 claims.

█ Defendants have also moved for summary judgment on plaintiffs' state law claims. However, now that the court has concluded that defendants are entitled to summary judgment on plaintiffs' federal claims, this court may decline to exercise jurisdiction over the state law claims. *See* 28 U.S.C. § 1367(c)(3); *Saglioccolo v. Eagle Ins. Co.,* 112 F.3d 226 (6th Cir.1997); *Valot v. Southeast Local School Dist. Bd. of Educ.,* 107 F.3d 1220 (6th Cir.1997). Indeed, " 'if the federal claims are dismissed before trial, ... the state claims [generally] should be dismissed as well.' " *Taylor v. First of America Bank–Wayne,* 973 F.2d 1284, 1287 (6th Cir.1992) (quoting *United Mine Workers v. Gibbs,* 383 U.S. 715, 726, 86 S.Ct. 1130, 1139, 16 L.Ed.2d 218 (1966)).

This court is mindful of the need to weigh the interests of judicial economy and avoidance of multiplicity of litigation against the threat of needlessly deciding state law claims. *See Landefeld v. Marion General Hosp., Inc.,* 994 F.2d 1178, 1182 (6th Cir. 1993). However, there are additional reasons for not assuming jurisdiction of the state law claims. Plaintiffs' state law claims are poorly delineated in the complaint. These claims raise novel, complex and important issues of state law in terms of the poten-

tial liability of human service agencies and their employees. *See* 28 U.S.C. § 1367(c)(1). Defendants have also raised the complex state law issue of whether they are entitled to immunity under O.R.C. §§ 2744.02 and 2744.03. The court therefore declines to exercise supplemental jurisdiction over plaintiffs' state law claims under 28 U.S.C. § 1367.

Defendants have also moved to strike portions of Mrs. Reed's affidavit on the grounds that it contains hearsay, conclusory allegations, statements unsupported by personal knowledge, and statements inconsistent with her deposition testimony. Under Fed. R.Civ.P. 56(e), affidavits "shall be made on personal knowledge, shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify to the matters stated therein." The court agrees that the majority of defendants' objections and their motion to strike is well taken. However, the court notes that even if the objectionable material in the affidavit is considered, this evidence is still insufficient to create a genuine issue of material fact as to the defendants' liability.

In accordance with the foregoing, defendants' motion for summary judgment on plaintiffs' claims under 42 U.S.C. §§ 1983, 1985 and 1986 is granted, and the clerk is directed to enter judgment in favor of the defendants and against plaintiffs on those claims. The court declines to exercise jurisdiction over plaintiffs' state law claims, and they are dismissed without prejudice.

It is so ordered.